## Singleton's Will.

LEWIS SINGLETON AND OTHER DEVISEES, AGAINST WILLIAM
SINGLETON AND OTHER HEIRS OF JECONIAS SINGLETON.

[Mr. Hewitt for appellants: Mr. J. T. Morehead, Mr. Owsley, and Mr.
Crittenden for appellees.]

FROM THE CIRCUIT COURT FOR WOODFORD COUNTY.

Judge EWING delivered the following as the Opinion—Judge
*Marshall* concurring, and stating some additional reasons for
the decision: the *Chief Justice* dissenting.

WILLIAM SINGLETON, JAMES BROWN and WIFE—the for-
mer being the son, and the latter the daughter of Jeco-
nias Singleton, deceased, filed their bill, to set aside
and annul a paper purporting to be his last will and tes-
tament, which had been previously recorded in the
County Court of Woodford, making John, Elijah and
Lewis, sons and principal devisees and executors of the
will, defendants, also a grand daughter.

They charge that said paper had been signed, sealed
and executed, in due and proper form, by the testator;
but that he was of insane mind and memory, at and be-
fore it was published, and was laboring under an un-
founded prejudice against, and insane aversion to, his
son William; and that the pretended will was produced
by the undue and controlling influence of the principal
devisees, the defendants.

The three sons, the defendants, answer the bill—de-
nying its allegations; and the facts averred in the bill,

*May 9.*

The parties, plea-
dings, and issue
—tried by a jury.

Spring Term
1839.

*Singleton's
Will.*

The validity of a
will was contes-
ted by a bill in
ch'y, which—ad-
mitting that the
will was execu-
ted in due form—
alleged that the
testator was in-
sane—his mind
affected with an
insane aversion
to, and prejudice
against, one of his
sons, when the
will was made;
and that he was
induced to make
it, as it was, by
the fraud and un-
due influence of
the principal de-
visees. These al-
legations, the an-
swers deny. The
issue, to be tried
by a jury (under
the statute, S. L.
1543,) "whether
the writing pro-
duced be the will
of the testator or
not"—should be
so framed as to
present the ques-
tion, whether the
allegations of in-
sanity, fraud &c.
are true or not;
and the *onus pro-
bandi* being upon
the *comp'ts*, their
counsel have the
right to open and
conclude the ar-
gument to the ju-
ry.

and denied in the answer, were set down to be tried by a jury.

A struggle took place between the parties, before the Circuit Court, as to the form of the issue to be made, the object of which, on each side, was to obtain the opening and conclusion of the argument.

The statute does not prescribe the form of issue to be made up. But its object was evidently to submit to a jury for trial, those matters of fact in relation to the validity of the will, which were in *contest* between the parties, and not those matters about which they agreed. That which is conceded on both sides, could never be the subject of an issue, which is an affirmation on the one side, and a denial on the other.

The complainants in this case conceded in their bill, that the paper purporting to be a will, had been duly made and executed, in legal form, but averred that the testator, when it was made and before, was insane, and laboring under an insane aversion to his son, and was prevailed on to make it, by the fraud and undue influence of the defendants or some of them. The defendants admitted its execution in due form of law, and denied the insanity, insane aversion, and fraud and influence charged.

The execution of the will was admitted on both sides; of course, no issue need be formed about that. The only matters in controversy between the parties, and about which they were at issue, were the *incompetency* of the testator, and the *fraud* and *influence* of the defendants, or some of them. And the issue should have been so formed as to bring before the jury for trial those matters only. It was so formed, and we can perceive no error in the decisions of the Circuit Court, upon the various pleas and replications, the object and tendency of which were to require of the defendants to take issue only upon the matters contested by the complainants.

The burthen of proof to sustain the matters averred in the issue, necessarily devolved on the complainants. The due execution of the paper claimed as a will being admitted, it needed no proof to establish it. And as all persons are presumed to be sane until the contrary is

shown, it devolved on the complainants to make out, by proof, the insanity or undue influence alleged. And if they failed to do so, the will must have been sustained. As the burthen of proof rested upon them, they had the right to open and conclude the argument before the jury.

It is next contended, and assigned for error, that the Circuit Court erred, in not permitting one of the defendants to cross examine his mother, a witness introduced by the complainants.

It appeared, that he had, in conjunction with the other defendants, employed counsel, who were present in Court, attending to the case; that, with a view to obtain the privilege of cross-examining his mother, he had, in *form*, discharged his counsel, but admitted that he would not have done so, but for the consideration and conviction that his interest was so intimately and inseperably connected with his co-defendants, that, in defending their interest, they would necessarily defend his, and that the counsel still held the joint contract of them all, for their fee, and determined to hold him responsible upon it; and did cross-examine the witness, and continue to attend to the case throughout.

It is evident that, the pretended discharge of his counsel was a mere stratagem, on the part of the defendant, to evade the rule and practice of the Court, requiring the examination of witnesses to be conducted through their counsel. And if so, the Court acted right, in not permitting itself to be trifled with by such a trick.

Besides: it does not appear, and cannot be presumed, that he has been prejudiced by the action of the Court in this matter.

The counsel continued the examination, and it is not to be presumed that their cross examination was less full and complete, than if the defendant had been permitted to make it, or that the truth has not been as fully elicited; and he was as much benefited by the examination, as if he had not in form discharged his counsel. Nor can we say that the ends of justice have not been as fully attained. But we have grounds to believe that much time has been saved, judging from the irrelevant

Spring Term 1839.

*Singleton's Will.*

One of several defts. discharged their counsel, so far as they represented him, in order that he might personally cross examine a witness; but the interests of all the defts. were identical; the counsel continued to represent the others—else *he* would not have discharged them, as he admitted, & they did not exonerate him from liability for their fees. The circuit court refused to allow the party the privilege he claimed; & this court—conceiving that the proceeding was a mere manœuvre to evade a rule of court—approves that decision.—The fact that the party was not injured by it, (as he had the full benefit of a thorough cross examination) is another reason for sustaining it.

Spring Term
1839.

*Singleton's
Will.*

Instructions, upon an issue in ch. to try the validity of a will—that the paper produced is *prima facie* a valid will; & that 'the burden of proof rests upon the compts. to show that, at the time of its execution, the the testator was of insane mind and memory, or that he signed, executed & published the same, under the influence of an insane and unfounded aversion to his son ——, one of the pltfs. or that it was procured to be executed & published by the fraud, undue influence and importunity of the defts., or some of them'—presents a correct exposition of the law: there was no error in refusing to instruct the jury that the facts relied on by the complainants to destroy the will, mustbemade out "by the clearest and most satisfactory proof:" such as would satisfy the minds of the jury, was all that the law required.

questions propounded by this defendant, to his mother, in her cross examination in the country, where her deposition *de bene esse* was taken in this cause.

It is also contended that, the Circuit Court erred in refusing an instruction asked by the defendants, and in giving those asked by the plaintiffs.

The instruction offered by the defendants, and rejected by the Court, in substance, directed the jury that it was incumbent on the plaintiffs to establish the insanity, insane aversion, or undue influence, " by the clearest and most satisfactory proofs." Instead of which, the Court gave to the jury, at the instance of the defendants, the following instruction, to wit:—

" That the paper marked B, and referred to in the issue in this cause, as the will, is *prima facie* evidence that it is the true, lawful and valid will of Jeconias Singleton, deceased; and that, under the issue which the jury are to try, the burthen of proof rests upon the complainants to show that, at the time of its execution, the said Jeconias was of insane mind and memory, or that he signed, executed and published the same, under the influence of an insane and unfounded aversion to his son William, one of the plaintiffs, or that it was procured to be executed and published by the fraud, undue influence and importunity of the defendants, or some of them."

This instruction gave to the jury a correct exposition of the law, as to the proof to be made, as well as upon whom it was incumbent, and so clearly as to enable them distinctly to understand their duty. And we cannot say that the Court has erred in excluding from the instruction, the superlative expletives, " the clearest and most satisfactory proofs." If the facts are made out by proof to their satisfaction, it is all the law requires.

And the introduction of those words may have produced an impression upon their minds, that a superior quality or grade of evidence, not at all attainable, was requisite to authorize them to find those matters. At least, we are not prepared to say that the Court erred to the prejudice of the defendants, by refusing to adopt them, in his exposition of the law to the jury.

There is an inaccuracy in the latter part of one of the instructions given at the instance of the plaintiffs, in the use of the word "*or*," instead of *and*, by which the Court is made to inform the jury, that if they believed from the evidence, that the will " was procured to be. made, by the fraud, undue influence, *or importunity*, of the defendants, they should find for the plaintiffs."

It may be, that the word " *or* " has been substituted in the place of *and* in the copy, as was done in another part of this instruction, as was shown at the hearing, by the production of the original. But taking the copy as true, we were at first made to doubt, whether the error was not fatal to the instruction.

For we are not prepared to admit that *importunity* alone, disconnected with fraud or under influence, would be sufficient ground to set aside a will.

But taking the whole instruction together, and applying it to the proof, we can scarcely belive that the jury could have been misled by it, or that they would have even noticed the critical inaccuracy, or the difference in the force of the instruction, by the use of the disjunctive instead of the copulative conjunction, in the place where it was used. And we are the more inclined to this conclusion, as it was not noticed even by the astute counsel for the defendants in this case.

But the Court is relieved from any difficulty on this point, by recurring to the foregoing instruction, granted at the instance of the defendants. By it, the jury were in substance instructed upon this same matter, in issue between the parties, that they could not find for the plaintiffs, unless it was established, to their satisfaction, that the " will was procured to be executed and published by the fraud, undue influence *and* importunity of the defendants, or some of them." If the instruction given at the instance of the plaintiffs, was critically incorrect, its force and effect were neutralized by the instruction given at the instance of the defendants, upon the same point.

The jury having found the issue for the plaintiffs, the question arises—what is the effect to be given to their verdict by the Court? Is their finding to have the force

Spring Term
1839.

*Singleton's
Will.*

The validity of a will would not be affected by the mere fact, that it was obtained by the *importunity* of devisees; and therefore, an instruction that if the jury believed it was "obtained by the fraud, undue influence *or* importunity of the defts. they must find for the pltfs." were erroneous. —— But *correct* instructions having been *also* given, viz. 'that, unless the will was obtained by undue influence *and* importunity &c. they must find for the defts.' and it was not likely that the jury were misled by *the slip* in the one instruction— it is held not to be sufficient to set the verdict aside.

A verdict upon an issue in chancery, made up, in obedience to the statute of wills,

Spring Term
1839.

*Singleton's
Will.*

to try "whether
a writing pro-
duced, be the
will of the testa-
tor or not, which
shall be tried by
a jury, whose
verdict shall be
final between the
parties, saving to
the court a pow-
er of granting a
new trial for good
cause, as in other
trials" (S. Law,
1543,) is not like
an ordinary ver-
dict upon an is-
sue in a chancery
cause,——which
must satisfy the
conscience of the
chancellor, or be
disregarded; but
is like a verdict
in a common law
action, and can
only be set aside
on grounds that
would be fatal to
a common law
verdict. And—

and effect of a common law verdict, and to be set aside
only for the same causes, by the Court? or, the force
and effect only of a verdict found upon an ordinary
issue out of chancery, directed by the Chancellor, to en-
lighten his conscience, and which may be set aside at
his will and pleasure, or be wholly disregarded in mak-
ing his decree?

We are satisfied it should have the force and effect of
a common law verdict, and can be set aside by the Court
for the same causes only.

The statute directs, when the validity of a will shall
be contested by bill in chancery, that "an issue shall be
made up whether the writing produced be the will of
the testator or not, which *shall be tried by a jury,* whose
*verdict* shall be *final* between the parties, saving to the
Court the power of granting a new trial for *good cause,*
as *in other trials.*" The law makes it imperative upon
the Chancellor to submit the issue of facts to a jury.
By *law* the power is given to *them* to try it, and their
verdict is as binding and conclusive, as their verdict
would be upon any issue of facts, the trial of which is
confided to them by the principles of the common law.

Limiting the power of the Chancellor by this rule,
can this verdict be set aside, and a new trial granted?

Except those already disposed of, claimed to be errors
in the action of the Court, no other cause is alleged, but
that the verdict is " against law and evidence:" which
may be restricted to the single objection that, it is
against evidence, as there is no ground for saying that it
is against *law,* if it be found not to be against evidence.

In a common law
case, a new trial
will not be grant-
ed on the ground
that the verdict
is contrary to the
evidence, unless
it is palpably so.
And—

Where the court
below has refu-
sed a new trial
moved on the
ground of verdict
against evidence
—the error must
be flagrant, to in-
duce a reversal

It has been frequently settled by this Court, that a
new trial ought not to be granted on the ground that the
verdict is against evidence, unless it is *palpably so.* 3
*Bibb,* 313, *Weisiger* vs. *Graham &c;* 3 *Marsh.* 397; 1 *J.
J. Marsh,* 6; 2 *J. J. Marsh,* 310, and *sparsim* in the
Reports.

Again: that when the Court below has refused a new
trial, moved on the ground that the verdict was against
evidence, the error ought to be *flagrant* to induce this
Court to reverse the judgment. 2 *Bibb,* 64, *Porter* vs.
*Langhorn, and Maxwell* vs. *McIlvoy,* 211; 1 *Bibb,* 241,

*McKinney* vs. *McConnel;* 3 *Lit. R.* 14, 169, 189; 1 *Mon.* 111, 262.

Spring Term *1839.*

*Singleton's Will.*

Again: after a verdict has passed the ordeal of the lower Court, this Court should exercise its power over the subject with *great caution* and *circumspection.* The evidence is generally defectively presented to this Court. In such a case, the Court should make every rational inference against the party moving it, as if he had *demurred* to the *evidence.* 1 *Bibb,* 303; 3 *Lit. R.* 169.

by the Court of Appeals—whose power is exercised, in such cases, with great caution and circumspection.

In the foregoing views the whole Court concurs.

Limiting the powers of the Court by the foregoing rules, can this Court grant a new trial against the opinion of the Circuit Court, on the ground only that the verdict is against evidence, upon the facts exhibited in this record? The majority of the Court—the Chief Justice dissenting—think we cannot.

We cannot say from the facts proven, that the jury, in the exercise of their legitimate power of making their own rational deductions from them, were not warranted in coming to the conclusion that, one or more of the three distinct specifications in the complainants' replication, had been sustained.

It is often difficult for a jury or court to come to a satisfactory conclusion, on the delicate subject of insanity, as it is difficult to fathom the human mind. But many authorities concur in the conclusion, that where there is *delusion* there is insanity. That is, when things are believed to exist which have no existence in fact, or in the degree imagined, and of the non-existence of which, no argument or proof can convince the mind at that time and to that extent is insane. And this delusion may exist on one or more subjects, when the mind is rational, or seems to be so, upon all others. This delusion is frequently accompanied with other indicia of unsoundness, which may be found in rational persons, as violent passions, keen suspicion, jealousy, exaggeration, inconsistency, eccentricity, a hasty sensibility. to imagined wrongs, and a versatility in the objects of hatred or affection: the existence of which, as they are the common concomitants of delusion, strengthens and sustains the proof as to the existence of delusion. It is not un-

Insanity not always obvious: whether it did or did not exist at a particular period, is often a perplexing question for courts and juries.

Certain symptoms or indications of insanity or monomania de scribed.

Spring Term
1839.

*Singleton's
Will.*

Summary of the evidence, and opinion (of a majority of the Judges,) that the jury might reasonably have come to the conclusion that the testator was of unsound mind, *or was induced to make the will as it was, by the undue influence of the devisees or some of them; and that, the jury having found against the will, and the verdict having been sustained by the circuit court—this court ought not to disturb it.*

frequent, nay quite common, with the shattered mind, to hate with the most relentless hatred, and without any sufficient cause, the objects of its former peculiar affection and special regard; and in this particular to run counter to those natural feelings which are common characteristics of our nature.

Without attempting to enter into a critical analysis of the testimony, it must be conceded as proven, that the decedent, at times labored under extraordinary delusions for years before the will was made. That he imagined at times, that persons were in pursuit of him to kill him; at others, that they were about to take him to the *lunatic asylum;* that he was *ruined,* and his whole family were *ruined.* And under the paroxysms of frenzy he would sometimes spring from his bed, seize his gun, and escape from his house in his night clothes; at others, he would come riding home, rapidly, exclaiming that they were after him, to kill him, and making other similar demonstrations of delusion. It is true, it is proven that he drank hard at times; and it may be that those fits of excessive delusion may have been caused by intoxication, but the proof is not satisfactory that they were; and they seem at least to have extended beyond the periods of intoxication. It is also proven that a very sudden, extraordinary and unnatural change took place in his feelings towards his youngest son, who had remained with him until after he was thirty years of age, attending to his business, and who had always before been his favorite child; and that this change took place upon an alleged ground, which, on the proof in this case, may have been imaginary; and which, if real, would not be deemed sufficient by the well regulated mind. He made efforts to procure his son's expulsion from the church, and drove him from his house, ordering him never to return, and refused his mother permission to visit him, and never made friends with him.

There is also proof tending strongly to show, that the defendants, or some of them, operated upon his excited or disordered mind, by their *conduct* and *conversations,* to keep alive his inveterate feelings against his son, and to make the impression that he ought not to make William

and Mrs. Brown equal with them, in the division of his estate.

And when efforts were made by strangers, for permission to William to come and see him, and to make friends with him, when seeming to yield to the proposition, his mind would suddenly recur to the defendants, and the necessity of seeing or sending for them. From which it might be inferred that he deemed it essential to consult them on the subject, as a preliminary step to a reconciliation with his discarded son, and if so, would imply *strongly* the influence which they exercised over him on that subject.

These facts and many others are proved, mainly by the wife of the decedent (an aged matron, the simplicity and candour of whose detail, carries with it intrinsic evidence of its truth,) and by others among the most intimate friends and acquaintances of the decedent; and some of them speak of him in general terms, as having been of unsound mind, for some ten or more years before the will was made, continuing up to the time and after it was made; and it is proved that, one of the defendants acknowledged his incompetency to make a will.

On the other side, there are many witnesses who had known him for many years, and who speak of him as a prudent, discreet and managing man, and say that they had never noticed the slightest symptoms of insanity; some of these, as well as the complainants' witnesses, speak of him as a violent, passionate and eccentric man; and it is easy to see that an undue control might be obtained over such a man, if he were not actually insane.

The draftsman of the will speaks of him, as having displayed great caution, care and deliberation, as well as mind and intelligence, in giving the details of the various devises embraced in the will.

But it may be remarked that the witnesses generally, who deposed for the defendants, had not the same opportunities afforded them, as the complainants' witnesses, to arrive at a true knowledge of his condition. They were, for the most part, mere general acquaintances, who met with him occasionally. The facts depos-

Spring Term
1839.

*Singleton's
Will.*

Lunacy apt to escape the notice of the casual observer. Lunatics sometimes display a remarkable degree of penetration and sagacity—eminently calculated to deceive the most acute observer.

ed to by the complainants' witnesses, may be true, and not at all inconsistent with the facts or opinions proven by the defendants' witnesses. For it may be remarked, that lunacy may exist and escape not only the observation of the casual observer, but his strictest scrutiny. And instances have occurred, in cases of settled lunacy, that art, stratagem and cunning have been displayed in a most extraordinary degree, in the accomplishment of a favorite object.

And it may be, in the case before us, that his purpose being fixed to disinherit his son and daughter, operated upon by the influence of the defendants, he assumed a deliberation, and calm and apparently settled purpose, with a view to the accomplishment of his object, by which the draftsman and intended witness to the will, might well be deceived. And if he was acting under the influence of the defendants, his leaving at different times, in the progress of its execution, as difficulties with respect to different devises presented themselves, and returning again at the end of a few days, may have been to consult them on the subject, and to obtain their views in relation to the difficulties.

Be this as it may, it appears that he declared to the draftsman of the will, by way of removing the astonishment, expressed by his countenance at the exclusion of William, that "never was a father treated so badly by a son; that he had seen him lying in his fence corners, with his gun, to shoot him, and that he was afraid to go about his farm." But although there seems to have been a single occasion, when under the influence of his excited feelings and imagination, he may have supposed that William was pointing a gun at him, for the purpose of shooting him, yet there seems to have been so little foundation for the apprehension expressed, and its existence, as indicated by this statement to the draftsman of the will, connects itself so readily with the gross delusions of the sane mind, which have been before mentioned, that we cannot say that the jury were not at liberty to regard this statement of the decedent, as some evidence, that he was laboring under a most serious de-

lusion with regard to his son William, at the *very moment* of making the will.

Since writing the foregoing part of this opinion, in which a majority of the Court concurs, having seen a statement of a portion of the evidence, and the conclusion to which the Chief Justice has arrived upon the whole case, it is deemed proper to give, more at large, some of the evidence against the validity of the will, and upon which the majority of the Court have based their conclusion.

Ben Taylor, the nephew of the decedent, who lived near the decedent, and was upon terms of the utmost intimacy with him and the family, frequently paying and receiving visits from each other, and who, it must be admitted, is a man of intelligence, discrimination and judgment, says that he did not regard him in his right mind for many years before the will was made. He states "that he applied to him frequently, to write his will. He never refused to write it, but was unwilling to do so, from a belief that he would make an *unjust will;* that from his knowledge of the decedent's "*temperament of mind,*" his high temper, and his great *aversion* to each of his sons at times, and other causes detailed by him, "he did not think that he was of proper disposing mind." He states that, "the intercourse of Will with his father was that of a most dutiful and faithful son, for thirty years, attending faithfully to his business, and always manifesting the deepest interest in his affairs," until after he was expelled from his house. Again: he states "that from the unnatural feelings manifested by Colonel Singleton towards his family, and particularly his sons, he came to the conclusion that he was laboring under *alienation of mind.*" That this unnatural feeling would sometimes fall on one son, and then on another, but eventually settled on William, and continued till his death. He also states that, Colonel Singleton would often invite himself to the houses of his relations to dine, and would suddenly, when dinner was on the eve of be-

ing ready, take some freak, order his wife, and break off and go home, without any apparent reason. He speaks of him as a man of *ungovernable passions, gloomy apprehensions* and *keen suspicions*, and *fears* about dangers that no well regulated mind would entertain.

Mr. Blackburn, the pastor of the church in which the decedent was a member, and who was particularly intimate with him, gives the circumstances that occurred in the church, and various other facts indicating unsoundness of mind. He says that he took part against William, to procure his expulsion from the church, and was *passionate, vehement* and unnatural in his conduct to William, and flew into a *violent rage* because the church would not hear the *evidence* of a *slave against him;* and though he and others made every effort to reconcile him, they could do nothing with him. William behaved humbly and respectfully to his father, and to gratify him, withdrew from the church. He was ordered by his father never to set his foot on his place again. And whenever, afterwards, the name of William was mentioned, which happened on various occasions, up to his death, he would fly into a *violent* and *ungovernable rage,* and *act* like a madman. He states that the sole ground of complaint against William, and that for which he prosecuted him in the church, was that he had been guilty of sexual intercourse with one of his negro girls; which William always solemnly denied, and which his mother and others believed there was no foundation for; and the only proof, as alleged by him, was that he was told so by one of his negro women, whose husband William had forbid to come on the place, on account of some charge of poisoning; after which, the decedent stated he had watched William, for some time, and saw the "*girl hand him some water at the spring,*" and was forthwith confirmed in his opinion of his guilt, and commenced his persecution of him.

This witness states, from his *unnatural, wild* and *frantic* conduct towards his son, and other circumstances detailed, he came to the conclusion that he, though apparently rational upon some subjects, was upon others *insane,* and particularly towards his *son William.* The facts

detailed by this witness, though possibly they might have taken place with a rational mind, are unnatural, unusual and extraordinary, and certainly tend, in no slight degree, to the conclusion, that his mind was diseased, and that he labored under an insane aversion to his son.

Mrs. Singleton, wife of the decedent, states that Colonel Singleton would often "imagine that things existed "which no other person would.  He would oftentimes "come into the house, and ask the witness if she did not "think he was deranged.  He would jump up out of his "bed at night, and say that some person was there, and "wanted to kill him.  He got out of his bed at night, "and would go out in his night clothes, with his gun, "late in the night, and say that some person was there "to kill him.  He would do this in very cold weather, "and in warm: it made no difference.  He never said "who it was that wanted to kill him.  He would some- "times say, that he saw two of his sons, sometimes one, "that wanted to kill him.  All this happened before and "after the will was made, and about the time it was "making.  After Will had been ordered off by his fa- "ther, he came to the house with a man by the name of "Morton, and met his father, and offered him his hand, "and the old man raised his cane on Will as if he would "strike him, and said to the witness, " did you see the "assurance of William?" and appeared to be in a great "rage.  The old man would sometimes, at night, call up "all his hands, and set them to work, pulling hemp, and "would immediately call them off, and set them to doing "something else, foolishly.  He would sometimes get "his horse and ride out to the farm, and would in a short "time come home, riding very fast, saying that they "were after him, to *kill him;* and would often say that "they were coming to take him to the Lexington Asy- "lum, and would beg the witness to let him stay with "her, and not to be taken to Lexington.  He seemed to "think that some person was there to take him off or "kill him, and she tried to persuade him out of it, but "could not do it.  This all took place before and after "the will was made.  He would sometimes say that, he

"believed Will was guilty, and then that he thought he
"was not. His conduct was very *different* in the *fore*
"*part* of his life. Any little thing would put him in a
"*violent rage* and *passion.* His sons had a *very great influ-*
"*ence* over him. The boys, when they came to see us,
"would ask if Will had quit *drinking* yet, and that the
"old man had better *give his property* to them—they had
"families and children, and Will had none. She heard
"the old man say, when he purchased the Blanton place,
"he intended it for Will, and that it was not to be con-
"sidered part of his estate, and that Will's work and
"labor went to pay for it. Previous to the charge
"against Will with Harriet, the old man liked Will
"better than any of his sons; he was his *favorite child,*
"and *youngest son.* She heard the old man say that the
"*boys said,* that he *ought not to give Will and Brown much*
"*of his property.* She heard John Singleton say, in the
"presence and hearing of the old man, when he was ly-
"ing on his settee, do you see the *striking likeness of Har-*
"*riet's child* to Will; the old man said—*Oh Jonny, Jonny.*
"She *frequently heard* such things pass. After the old
"man's death, John brought the will home, and asked
"the witness if she did not wish to hear it read: she
"said she did; and when he read that part which said
"that he was of *sound* and *disposing* mind, but weak of
"body, the witness said, now John, don't you know,
"that is not so, that the old man was not in his right
"mind; John replied, '*yes, I do know that he has not been in*
"*his right mind for four or five years past,* and was not
"*able* to *make* a *will.*'  "Lewis has said to me that Wil-
"liam *should not have any more of his father's estate.*"  It is
true she states "that he drank amazing hard at times;
"but he acted like he was deranged and badly, when he
"was not drinking, and when there was no liquor about
"the house." And no other witness speaks of his strange
and unnatural conduct and violent paroxysms being
ascribable to drink, or that he was at all intoxicated at
the time. She also stated that, "for the last *two* or *three*
"*years of his life,* he did not attend much to his business.
"He was sometimes in his mind, and would talk as well
"as any person; but at other times would be very *flighty.*

"He would sometimes get his book, and read *very loud*, "then *very fast*, then would *mock* the preacher's way of "*reading* and *singing;* and had not, for a number of years, "been able to *arrange his papers*, and could not *write a* "*note*, and would call on Eliza Jane, to help him, and "would *forget* what she had said, and call her back again, "to *tell him* what to *write*. He did not at all times be- "lieve that Harriet's child was Billy's. She, the wit- "ness, did not believe it was."

Mr. Hedger, a witness, "had known him for thirty "years, had done carpenter's work for him, was in the "habit of seeing him often in 1834 and since; and from "his knowledge of him, he was of opinion he was de- "ranged; and details facts upon which his opinion is "founded."

Mr. Jessee "knew Colonel Singleton for many years, "and from his knowledge of him, did look upon him as a "*madman* in relation to his son William."

"Before the church committee, he said that he had "been watching Will for six months, and looking out of "the window one morning, he had seen the girl *hand* "*Will a drink of water*, and that was all he know of his "guilt. William offered to go down upon his knees and "beg his father's pardon, if he would forgive him; the "old man said he would forgive him, if he would leave "his house, and never set foot on his place again. The "witness, after the separation, told the old man that "Will wished to become reconciled to him. When it "was named, he immediately went into a *violent rage*, "*stamping* and *throwing* his arms about. He said to the "witness that he did not believe that Will was guilty, but "that it was a trick of old Daniel's. He further states, "that it is his opinion, that no man in his *proper senses* "would have acted towards his son as he did towards "William, whether the charge was true or false."

Mr. Christopher states, " he was a neighbor of the old "man, and sometime in the forepart of 1825, started to "his house, and met him in the road. He was in a sin- "gular way, riding first on one side of the road and then "the other; he did not know me at first, but after I "hailed him, he turned and said, *Davy* I am *ruined;* when

"did you see Billy? I told him I had seen him that "morning; he then said he was a *ruined man.* He asked "again when I had seen Billy; I told him, and he re-"peated—I am a *ruined man;* and said he could not "sleep, and could not do any thing; became *enraged,* "*scratched* his *head, cried like* a child, and said *they* would "*ruin* him; that *they had made him do something* that would "ruin him. I asked, what? who had? He said I would "tell, and *they* would *kill him.* I asked him if Billy had "done any thing; he said no, Billy was a good child. "He said they had stoned him: stoned his house, and "tried to kill him; and said I must never *tell* what he "had told me: that *they* would kill him.

"He, the witness, made an effort with the old man, "to get him to make friends with Will. He opposed it, "but at last said, go and bring Billy, and he *would ge* "*John, and see Lewis.*"

Mr. Sullivan also proves several strange and unusual acts, and says that it was his opinion that he was *deranged.*

Though William, in the sequel, acted imprudently and unjustifiably towards a parent, whatever cause might have existed, it is evident, from the proof, that the *unusual, unnatural* and *violent conduct* of the father, indicating an *unnatural aversion* to his son, and a *diseased* state of mind, preceded the misconduct of the son, and could not have been produced by it. And therefore, if the rash expressions of the son, after a continued persecution on the part of the father, were ever borne to his ears, it does not necessarily follow, that his disinherison was caused by those rash expressions; but it might well be inferred by the jury, that his exclusion rested upon a different foundation, and was produced by a different cause: namely, an *unnatural* and *insane aversion* to his son, inflamed and kept alive by the sinister influences of his other sons.

Upon the whole, although we might not, as original triers of the facts, have come to the conclusion, that the will was invalid—without analyzing or reasoning upon the many facts that point to a diseased state of mind, and to an insane aversion to his son, as well as to an un-

due and improper influence exercised over the decedent by the principal beneficiaries in the will, and from which the jury might rationally have inferred the continuance of some or all those operating causes at the very time of making the will—the majority of the Court are perfectly satisfied, that after the jury have passed upon the facts exhibited in this record, and found a verdict against the validity of the will, and the Circuit Court before whom the witnesses were examined, face to face, has refused a new trial, that this Court ought not to disturb the verdict.

Judgment affirmed with costs.

JUDGE MARSHALL's additional view.

I DEEM it only necessary, in brief and very general terms, to present one additional view, on which, if there were no others, I think the jury were justified in finding their verdict; and on which, therefore, I concur in the judgment of affirmance pronounced by Judge EwING, as the judgment of the majority of the Court.

It is true, that after the deceased had imbibed and displayed a most determined hostility to his son William; after the father, on the occasion of the first display of that hostility, in the matter of endeavoring to expel him from the church, had refused his offer to go down upon his knees and beg his forgiveness, telling him he would forgive him only on condition he would never set foot on his place again, and after—as the jury might have inferred—the father had subsequently met his attempt to give him his hand, with an offer to strike him with his stick—William appears, on two or three occasions, in his absence, to have given way to feelings, and used expressions in regard to him, which no conduct in a father can justify in a son. But, if the jury might have found in this conduct of William, a cause sufficient to induce even a rational but severe father to cut off an ungrateful son from any share in his estate,

Conclusion upon facts proved, that the jury would have been justifiable in finding against the will, upon the single consideration of undue influence exercised by the devisees. And— Opinion that,— where a son had given offence to his father, which had ripened into settled aversion, and absolute hostility, and other sons—instead of endeavoring to effect a reconciliation—take advantage of the peculiar temperament, prejudices, and excited feelings of the father, still further to inflame him, widen and perpetuate the breach, with a view of affecting the distribution of the estate of the father, who finally makes a will, by which the offending son

is disinherited, and larger shares given to the others, *they* should be deemed to have exercised that sort of undue influence over the father, which renders the will invalid.

they had, also, a right to trace this unhappy dissention to its source, and to follow its progress; they had a right to infer, from facts proved, that excessive and unfounded as were the feelings of the father in the first instance, they might have been allayed by the healing effects of time, or soothed by the efforts of mutual friends; that they were in fact softened more than once by the appeal of strangers, but that they were, from time to time, excited and inflamed by the insinuations of the defendants, or some of them, referring to the first cause of hostility. They might have found that the same defendants, the brother or brothers of William, who, as their mother testifies, had never once said, "Father, make friends with William," were the persons who communicated to their father, the intemperate expressions of his discarded son. And they might have found that the influence of these brothers, thus acquired and directed against the interests of William, had prevented the natural flow of that tide of affection which would have brought the father to a reconciliation with his son; and that they had fortified his heart against the intercession of friends. To this influence, operating on a mind which, if not actually insane, was subject to violent excitements and inveterate passions, and was, moreover, greatly impaired by age, by excessive drink, and by habitual subjection to the most extravagant delusions, they had a right to attribute the disinherison of William, and the concentration of the father's affections and estate upon the defendants. They had a right, therefore, to say, that this will was the result of this influence of the defendants upon the mind and will of their father, and not of his own deliberate judgment upon the conduct of his son.

While, therefore, I am free to say that, if there had been no rational ground, as in my opinion there is, for the deduction that the will was procured by the extraneous and undue influence of the defendants, or some of them, I should have had great doubts at least, whether the verdict ought to be sustained; I am unhesitatingly of opinion that, when some of the sons of a decedent have, contrary to their duty to a brother, taken advantage of

a casual excitement of their common father against him, and playing upon the peculiar temperament which this father is proved to have possessed, have, for their own advantages, widened into a state of mutual exasperation and hostility, a breach which they should have endeavoured to heal, and producing this state of things, with a view to its effect upon the distribution of the father's estate, have created in his mind, or essentially contributed to create, a fixed aversion to their brother, and a consequent fixed determination to exclude him from a participation in his estate; they have used means, and exercised an influence, undue and sinister, which, in justice and in law, as well as on principles of morality and benevolence, should deprive them of the advantage which they have unjustly endeavoured to obtain, by invalidating the will made under this undue and insidious influence. And believing that, although the evidence does not conclusively establish the exercise of such an influence in the procurement of the present will, it is clearly sufficient to authorize the finding of the fact to be so, I cannot, merely because I doubt as to the weight of the evidence on this point, or because I might doubt as to its sufficiency, or think it insufficient to sustain the verdict on the ground of insanity alone, withhold my consent from the general conclusion that the verdict should not be set aside by this Court, as being unsupported by the evidence.

Spring Term<br>**1839.**<br>*Singleton's*<br>*Will.*

### Chief Justice ROBERTSON's Opinion and Dissent.

THE point concerning which my associates and myself do not concur, is the important question, whether the jury had any sufficient ground for deciding against the validity of the paper purporting to be the last will of

Review of the evidence, and o-pinion that, it proves nothing more, than that the testator—naturally a man of strong feelings

and violent passions—was addicted to intoxication—producing in him, as it does in many others, a peculiar sensativeness and excitability, extravagant notions, and occasional fits of great violence and absurd raving—all of which subsided when the liquor ceased to operate—leaving his naturally strong and acute mind to its ordinary, rational impulses; that when he first went to make the will, at each of several times when he returned, after some progress had been made and the writing suspended, and at its execution, he was free of insanity and intoxication—cool, deliberate, circumspect, and entirely competent; and that there is no evidence whatever, in the record, of any fraud or undue influence on the part of the devisees, in procuring the will; and that the proof, upon the whole case, is wholly insufficient to sustain the verdict.

Jeconias Singleton, deceased and which had been established as such, by the County Court of Woodford.

This question is divisible into three subordinate questions—to wit:

*First.* Was there any rational ground for a deduction by the jury, that the testator had not a general capacity sufficient to enable him to make a judicious and valid disposition of his estate?

*Second.* Did the facts authorize a belief that the will had been procured by the fraud, or undue influence, of any of the devisees?

*Third.* Did the evidence justify a conclusion that the testator's conduct towards his son *William* was the offspring of an *insane* aversion to him, or of an insane delusion concerning him?

A thorough and anxious analysis of the record, has impressed on my judgment a strong conviction, perfectly satisfactory to myself, that all the testimony, when carefully considered and rightly understood, leaves no *rational* ground for the opinion, either that the testator, *when he published his will,* labored under legal incapacity, general or special; or that his will was the product of fraud or sinister influence; or that it was not, in every effectual sense, the voluntary and well considered act of a disposing mind.

And therefore, as I cannot agree to approve the verdict of the jury on the special issue of *devisavit vel non,* and as, more especially, the opinion just delivered presents some imposing reasons for sustaining the jury—I feel compelled to suggest some of the considerations which force me to an opposite conclusion.

*First.* As to the testator's general capacity: it does seem to me that, no experienced and rational mind can deliberately and dispassionately doubt. And I do not understand my colleagues as intimating any doubt upon that question.

The testator's widow was the chief, and, as I think, only material witness as to this first point. She frankly admitted that, on account chiefly of her son *William,* who seems to have been the darling of her heart, she felt a strong leaning against the will, and was anxious

to have it set aside, as unequal and unjust. And even *her* testimony, considered altogether, shows clearly, in my view, that the testator's general capacity to dispose of his estate, by will or otherwise, was always sufficient when he was relieved from the effects of intoxication. She expressed the opinion that his mind was never *exactly right* since Hopkins' campaign, in the year 1812! But the reasons suggested for that opinion are, to my mind, altogether insufficient to allow even a suspicion of general incapacity; and they are even, as I think, not sufficient to authorize the inference of *partial insanity*. Indeed, all the facts proven by her, amount only to this—that her husband, in her own strong language, "*drank amazing hard;*" that, when under the distracting influence of long intoxication, he was sometimes erratic, and imagined, as most persons in a similar condition frequently do, that he saw things which his natural eyes did not see, and was beset with perils which did not exist; that his passions were sometimes unreasonably violent, and especially as to William—*and therefore, she considered him sometimes insane*. She testified that the family endeavored to conceal from the world the testator's intemperate habits; that he "generally drank at home;" that, when drunk, "he was like a man deranged." She "sometimes thought it was from drink;" she did "not think he was constantly so;" she "thought it an ungenerous will among his children;" that she also thought it unjust to herself, and that she did "not feel reconciled to it." And these were "the reasons why she was opposed to it." She thought "his drinking was sometimes "the cause of his derangement and violence among his "negroes"—"he concealed from (her) the fact that he had made a will, until three or four days before his death."

Whatever effect should be given to this testimony—it can be admitted as proving only—what characterizes the conduct of most habitual drunkards—violent passions and occasional derangement, and even optical illusions, during and some time after a season of intoxication.

But Mrs. Singleton does not deny that her husband

generally managed his own large estate; that he made his own fortune, and continued, to his death, to increase it, and that he was sane when perfectly well and sober, unless, as *she* seemed to think, his conduct to William was evidence of insanity. And therefore, even if the only testimony in favor of the validity of the will, had been that of the writer of it—proving—as it does—beyond a rational doubt, that he was then perfectly *sane* and self-possessed—I should not doubt that, so far as general capacity was alone concerned, the jury could have had no pretext for deciding against the will.

But there was much more, and very strong, testimony in favor of the testator's capacity.

Allen, who was the testator's overseer in 1833—when, according to Mrs. Singleton's opinion, he was as insane as ever he was—deposed that, *he* " thought he managed " things on his farm well;" and said also—" I was much " pleased with him as an employer—I have seen him " *mad*, but did not think him *crazy*." And this witness had been an observer of some of the scenes and acts which Mrs. Singleton seemed to consider as proofs of an insane mind. But *he* did not make any such deduction: *he* knew the cause to be occasional passion and drunkenness.

*William B. Blackburn* deposed, that he had been a neighbor and intimate acquaintance of Col. Singleton, the testator, ever since the year 1812; " had been his " counsellor at law for many years; had transacted bu- " siness with him, at various times, and on a variety " of subjects; had been associated with him in political " contests; and never saw any act, or heard any expres- " sion from the testator, from which he would infer the " *slightest* mental derangement; but, on the contrary, he " believed he was an industrious, economical, and enter- " prising man."

*Thomas Bullock* deposed that he had known Col. Singleton " intimately " for forty years, during twenty of which he had " lived a neighbor to him;" and that it " would never have entered into his mind that he was " the *least* deranged;" he had " had a great many deal- " ings with him, and frequent conversations on religious

" and other subjects "—and, for some years before his death, he had met him frequently in Versailles, and "had discovered *no alteration in him*."

Dr. *Blackburn*, who had been the family physician of Col. Singleton about twelve years before his death, and had, afterwards, "a common acquaintance" with him until his death, deposed, that he "had never observed " any symptom of derangement."

*Thomas Helm*, who had lived "about two miles from " Col. Singleton, the last thirty years, and had known "him well"—deposed that, though he "had a great " many curious ways "—"he made the best crops in the neighborhood, and got the best prices for them—was a skilful trader," and had not, as this witness "supposed," " an unsound mind."

*Bernard Gillner* had been well acquainted with Col. Singleton, ".for the last twenty years"—had had frequent conversations "with him on religious and other " subjects—and believed he was *as free from insanity as* " *any man*."

*David Humphreys* had frequently conversed with Col. Singleton, from 1832 to the end of 1835—about currency and banks and making his will; and considered him, at all times, cautious and prudent—never manifesting any symptom of unsoundness of mind. He also deposed that the testator had told him that he had been anxious for a reconciliation with William; but that he never should have any thing *more* of his estate, because he had treated him "*badly*," and had produced "*confusion in his family*."

*John Garret*, about thirty years old, had known Col. Singleton from his (witness') infancy—"had seen him *in all* the relations of life "—had never suspected "any " derangement of mind, and had never heard such an " *intimation*."

*William Barr* had lived in a house of Col. Singleton, from 1823, "many years;" had "transacted" much business with him, and never *heard* or *suspected* that his mind was unsound.

*George M. Pinkard*, a subscribing witness to the will, had been well acquainted with the testator from 1822;

had occupied one of his houses in Versailles, as a store house for vending goods; had done much business with him; never discovered any unsoundness of mind, nor any " change whatever as regarded his capacity for business;" and also deposed to facts, occurring at the time he attested the will, which exhibit intrinsic evidence of a degree of intelligence, self-possession and caution, rarely displayed on similar occasions.

Samuel Wilson, another attesting witness, and who wrote the will, had been the testator's counsellor and attorney at law; was intimately acquainted with him, and was always pleased to converse with him; when requested by the testator to write his will, and informed that he desired as much secrecy as possible, the witness appointed a night for the testator to visit him, for the purpose of having the will carefully prepared; he *attended punctually at the appointed time*; was cool and perfectly rational; conversed freely, and very intelligently, about the dispositions he intended to make of his estate, and the reasons which operated on his judgment. *The will was written exactly according to the testator's suggestions*, but not finished until next morning after it was commenced; and the testator then desired, for very satisfactory and prudential reasons, to postpone, for several days, the publication of the will; and a future day for meeting in Versailles, for the purpose of signing and attesting the will, was fixed; and *the testator appeared at the precise time and place appointed*; and, after *much intelligent conversation, and the manifestation of unusual caution and prudence*, he published his will, in the presence of *Wilson* and *Pinkard*, who attested it.

*Wilson* had no doubt of the testator's capacity, or of his freedom of volition. And the various and minute conversations and other circumstances proved by him, cannot be reconciled with unsoundness of mind, or with any want of self-possession and self-will *at the time of publication*.

Now, it does seem to me, that no intelligent and impartial mind, acquainted with the " ways of men," can consider all the testimony carefully, and feel a rational doubt—though the testator was sometimes erratic and

violent at home, when under the influence of strong drink and its consequences—that nevertheless, when he was from home, and perfectly free from the effects of ardent drink, he was as sane as other men; and that, when he made and published his will, he had, unquestionably, a disposing mind, so far as general capacity to manage and dispose of his estate was essential.

*Second.* There is, in my judgment, no fact which could authorize a rational deduction that, the will was produced by the influence or fraud of any of the devisees: on the contrary, there is much reason to believe that, it is just what the testator had, for a long time, coolly and intelligently resolved that it should be. And, as there is no *testimony* which can impeach the will for fraud or extraneous influence, I will proceed to the last point.

*Third.* No doctrine of either law or metaphysics is more liable to misconception and abuse, or has been oftener misunderstood and misapplied, than that of *monomania*, or insanity on one subject whilst there is perfect sanity on all others.

And, in my opinion, the total misapplication of it was never more conspicuously and fatally illustrated, than by the verdict in this case, if this matter be assumed as the ground of that verdict.

The testator's conduct towards his son William, does not appear to me to exhibit any characteristic symptom of *particular insanity.* It is conceding enough, perhaps too much, to admit that it was extravagant and unusual, in constancy and intensity. But surely every passionate, suspicious, and even unreasonable man, is not *therefore* insane. And, though insanity is delusion, all delusion even, is not insanity: far from it. All error is delusion; and in religion, politics, and the common affairs of domestic life, there always has been among men far from being insane, a species of delusion degenerating often into fanaticism. But the law will not, on this account merely, permit the *orthodox* to stultify the *heretical.*

The testator suspected his son William of conduct which he looked on with peculiar indignation and horror. I do not know that his suspicions were without rational

foundation. There is no testimony to that effect. Nor can I admit that the father's extreme sensibility on the subject of such a supposed breach in his household, committed by a favored son, who was a professing christian, and a co-member with himself in the same church, was any proof of *insane* delusion, or *insane* aversion. William certainly deported himself rudely and rebelliously towards his passionate and venerable father. He told his mother that he would cut his throat if he was not his father. When about his father's dwelling, he sometimes sang spiritual songs in a boisterous and ludicrous manner, for the purpose of convincing his father, as he said, that he was not with any of the negroes. He said to *Hurst*, that they had been dealing with "*damned rascals*"—alluding, as the witness understood, to his father and the other members of the church of which he had himself been a member, and for desiring his expulsion from which, as an unworthy member, his father was considered by some, as insane.

He also spoke of his father to others, in a manner equally profane and contemptuous. He told Hurst, that one of his father's slaves had dreamed that he had gone to heaven, and his master was not there. And he admitted to William Barr, that once, when his father was in one of his fields with some of his slaves, he (William) being near, said, in a loud soliloquy, "I see some negroes who have been telling *damned* lies on me, and I will have their hides;" and then naming one, and pointing his gun at him, said, "I will have that fellow's hide"—when the negro thus menaced ran off. He then said, "I see another," and pointing his gun at him, he run off also; and thereupon all of them ran out of the field, *their old master with them.*

And Barr also testified, that "his best impression was," that William told him "he pointed his gun at the old man, but of this he was not certain." "William said it was all in fun."

This conduct and these conversations on the part of William, were after his expulsion from his father's house. But they show his temper, and principles; and furnish some reason for the will, so far as he is concerned.

The desire to expel such a son from the church, and the actual expulsion of him from the father's own fireside, do not, to my mind, afford any evidence of *insanity.* Nor does it appear to me that—William being a hopeless old bachelor, and having been provided with a tract of land and slaves and other estate amply sufficient for his comfortable maintenance—the fact that his father gave him nothing more by his will, but devised his estate to those of his children who had been more prudent and respectful, and had wives and children, is no proof of insanity, irrational hostility, or even injustice.

*But here doubtless was the ground on which the verdict was returned against the will.*

I cannot think that such a verdict should pass the ordeal of this Court—not only untouched, but sanctioned.

I do verily believe, that such a verdict, in such a case, will tend to render insecure and comparatively delusive the cherished right, given by law to every free man of sound mind and legal discretion, to dispose, at his death, of the estate which he had acquired while living, and the chief end of toiling for which, may have been—as with many—the luxury of giving it, at his death, to those he loves or prefers. There is no doubt in my mind, that any of the witnesses, on either side, would, without any hesitation, or apprehension, have been willing to make a contract with Colonel Singleton, for any part of his estate, on the day of the publication of his will, or at any other time, when he was, as he generally was when from home, perfectly sober.

Feeling strong conviction that there was no rational foundation for the verdict; and presuming that the chief reason for it must have been that the will was considered unequal, and therefore unreasonable, by the jury, and that *the old widow*, and perhaps the concluding counsel also, made powerful appeals to their sympathies—I cannot agree that such a verdict shall receive my official confirmation.

It is my opinion that, by approving it, more credence is given to it, than either reason or law requires, or justice and right will allow. But my colleagues think otherwise, and I feel proper respect for their opinions.

All the testimony against the will, and of which the widow's is the substance and soul, tends *rationally* to show only what may be perfectly consistent with a disposing mind *at the time when the will was published.* And the testimony of the subscribing witnesses, and that of the other intelligent neighbors and long and intimate acquaintances of the testator, should, in my opinion, be considered perfectly conclusive as to his capacity to manage and dispose of his estate *judiciously* and effectually. There is, in my judgment, no essential conflict in the *facts*, or in the *proper* conclusions from them. On the one side, it appears that the testator, when at home, generally "drank amazing hard," and was, *therefore, then* and *occasionally* for some time after, unreasonable and ungovernable in his passions, and subject to optical and other illusions—the, no uncommon, concomitants of such intemperate habits of old men.

On the other side, many men, among the most intelligent and disinterested of the testator's old and intimate acquaintances, testified that they had never either suspected or heard of any material impairment or derangement of his mind. *Their* opinions were founded on what they knew and saw and heard when he was perfectly sober. And the *facts* proved by some of them, and especially the facts proved by the subscribing witnesses, leave, in my opinion, no ground for rational doubt as to his having a disposing mind when he published his will. It seems to me, that, so far as *general* capacity may be concerned, it is almost impossible to believe that he had not *then* such a *disposing mind;* and that such a deduction would be a *delusion,* almost, if not altogether, as irrational as any which has been ascribed by the widow or any other person to her husband. I do not understand my associates as sanctioning such a deduction; but as sustaining the verdict altogether on the ground of particular delusion towards *William*, and of sinister influence by some of the principal devisees.

*None* seemed to doubt the testator's capacity to manage his estate. "He made better crops, and got higher prices for them, than any of his neighbors"—he "managed *well*"—he made a large fortune, and, by his indus-

try, skill and provident conduct, *continued to increase it.*
He had capacity to do all this.

Was the testator insane towards his grand daughter?
He gave her nothing, because she married against his
advice. Possibly, he was unreasonable in this. But
was he therefore insane? Benjamin Taylor sometimes
" thought" he was insane *as to all his children!* And the
*Preacher* " thought" he was insane about the church af-
fair, because, and only because, his conduct was, in his
opinion, unreasonably violent.

Such—with the old lady's *facts*—is the character of
the proof as to *particular insanity.*

Did any enlightened Court, without the intervention
of a jury, ever set aside such a will, upon such facts as
this record exhibits? I have never, as I think, seen or
heard of any such judicial decision. Then, *must* this
Court sanction and confirm a *verdict* which decides what
no *Court* ever would or could decide? I think not. But
in this I may err. I repeat that there is, in my judg-
ment, no fact in the record, which should tend to prove
that the will was fraudulently procured or influenced by
any of the devisees.

This is briefly and hastily my general view of this
case.

Much more, as to both facts and deductions, might be
added; but my only object being to show that I have
some reason for my dissent, I will forbear to discuss
the case more fully or minutely.

I am clearly of the opinion, that there ought to be an-
other trial.

*Spring Term*
*1839.*

*Singleton's*
*Will.*

PETITION FOR A RE-HEARING.

[By Mr. Hewitt.]                                            *June* 10.

IN July, 1836, Jeconias Singleton, of Woodford county,
departed this life. At October session of the County
Court, his will was admitted to record. On the 26th
day of the same month, William Singleton and others
brought suit in chancery to annul the will. The de-

fendants answered, and the Chancellor directed—" that this cause be placed upon the common law docket of this Court, in order that the issue of fact made by the pleading in the cause, whether the *testator, at the time of making the will,* was of unsound mind and memory, and whether he was by any of the devisees induced by undue influence to make the same, in whole or in part."

By the statute which allows this method of procedure, it appears that " an issue shall be made up, whether the writing produced be the will of the testator or not," and which necessarily means, that the issue must be formed, before the Chancellor can direct it " shall be tried by a jury." And in this case, the Chancellor, so understanding the law, gave in writing the facts to be presented to the jury for their determination; and this order of the Chancellor cannot be disregarded, and a different issue made.

In maintenance of this position, I refer to the case of *Vancleave* vs. *Beam,* 2 *Dana,* 156: "It may be well doubted, whether the Court ought to have permitted an issue to have been formed in any other manner than it was. *The obvious meaning of the statute was pursued, and it furnishes the best, if not the only, rule upon the subject.*"

In accordance with this view, the cause was transferred from the chancery to the common law docket; but instead of trying that which was directed, new pleading was permitted, without regard to the allegations of the bill and responses of the answers, and above all, the explicit order of the Chancellor on the translation of the cause.

It is manifest, that in this, the requisitions of the statute and general principles of pleading were violated.

But to take the issue as it was formed, to wit, " that the will was signed, executed and published, when he, the said Jeconias, was of unsound mind and memory; that he signed, executed and published the same, under the influence of an unfounded and insane aversion to his son William, and that it was procured to be executed and published by the fraud, undue influence and importunity of the said defendants, or some of them." This being the issue made in the common law forum,

and not that which was directed to be tried by the chancery tribunal, I will endeavor to show was not disposed of agreeably to the rules of law.   The issue admits that the testator was in the general of sound mind, and avers, at a particular period, to wit, at the signing and publishing of his will, he was of unsound mind, entertained an insane aversion to William, and was influenced by the principal devisees.

The devisees were relieved from proof to the extent of admissions by the pleadings.  *Starkie*, 1 *vol.* 3 *part*, 11 *section*, 388 *page*.   " No evidence is necessary to prove that which is agreed by the pleadings.  For the jury are sworn to try the matter in issue between the parties, and no other question is before them.  From admissions of record, the testator was generally of sound mind; under no insane aversion towards his son, and free from undue influence, fraud and other impositions; but is charged to have been laboring under all or some of them, *at the time* of making the will.

The Court say in the opinion given in the case, the issue was legally formed, and the complainants had a right to take upon themselves the burden of proof as they have done.   They have engaged to prove a *departure from nature,* an insane aversion to the son; foul practices by the sons on their father—*vile imputations*.  By what kind of evidence shall such debasing charges be established?   I reply in the language of *Williams on Executors*, 1 vol. page 17.  If a party impeach the validity of a will on account of a supposed incapacity of mind in the testator, it will be incumbent on such party to establish such incapacity, by *the clearest and most satisfactory proofs.*"   This rule of law the Circuit Court refused to recognize, by overruling an instruction which contained the very words, and this Court have sanctioned his action.   Permit me to enquire whether the repudiation is because the book is not authority, or the requisition is unreasonable?   The author gives the rule as a part of the common law, when it was adopted as a constituent portion of our jurisprudence, and therefore cannot be rejected as not authoritative.  There certainly can be nothing more reasonable than to require " the

clearest and most satisfactory proofs" of the sorest calamity which Heaven can inflict upon man—insanity, that deprives him of the control of his property and direction of his person, and the establishment of treason against a brother, and delusion on the father, as the Court, in their opinion, have pronounced.

If the devisees are guilty, as charged in the replication, their conduct is far more criminal than Andre's, who expiated his offence upon the gallows.

Will not, then, the Court demand " the clearest and most satisfactory proofs " of the averments, before they convict of deeds so heinous? It is but reasonable they should. But the Court criticise the philology of the instruction, and abolish the degrees of comparison which grammarians have instituted, by alleging that an instruction had been given in lieu of that which was rejected similar, in substance, but the adjectives in the positive degree only.

In vain have rhetoricians defined and refined language, if comparative and superlative qualities and properties and performances are confounded with positive or primary. The distinctions were made for obvious advantages; indeed, they are indispensably necessary.

Williams intended to require superlative proofs in such a case, and has so expressed himself in accordance with the rules of law and language, reason and propriety. But he is an elementary writer, and therefore not entitled to *superlative* weight. I think differently. Blackstone is an elementary author. Who controverts his correctness? Chitty is a rudimental writer. He is the pride of the profession. Mansfield has been lauded on the east and west of the Atlantic: he wrote not of first principles. Has not Junius demonstrated his errors in his *most* extolled opinions? An elementary writer compares the law from the beginning with each successive age, and gives it as it is at last, settled and improved, and therefore entitled to *more* respect. Why then deprive the devisees of the superlative degree of proof to which they have a right according to Williams? Why fix upon the testator insanity, and deprive him of the power of devising his estate, (for which he had toiled

through half a century,) to those of his offspring who in his judgment merited it, or whose situation required his bounty, without " the clearest and most satisfactory proofs?" It is not adjudged by the Court, that under the issue made, the complainants were not bound to establish the facts alleged by *satisfactory proof.*

Here I will premise that courts, both of original and appellate jurisdiction, ought to grant new trials in all cases, which result in *the loss* of life, liberty, property, character, right or privilege, unless the *weight* of testimony is clearly (if not most clearly,) in the the scale of the litigant who makes the demand, and claims that which belongs to, or is possessed by, another. To deprive one man of an advantage and bestow it upon another, without satisfactory proof, is unjust; and in this case, unless the proof is clear and satisfactory to the mind of this Court, the decree of the Circuit Judge ought to be reversed, and a new trial ordered.

Without reference to the numerous cases adjudicated upon motions for new trials, I am confident the position above asserted, can be supported. It is true, that upon no subject have the judgments of Courts so much oscillated as upon this. *This Court* ought to be entirely satisfied that the allegations of the replication are true. First, because the constitution intended to guard the tribunal against even the *influence* of the Legislature, and intended to vest it with ample power to *revise* the judgments of inferior Courts, and the verdicts of juries, without regard to *their* action. Secondly, a different Circuit Judge and another jury might, and I have no doubt would, think very differently from those who tried this case. Thirdly, because this Court have the right, and it is their duty to fix the principles in this cause, which shall govern all other similar cases throughout the State, so as to act upon all other judges and juries. Wherefore, unless *they* are satisfied from the proof that Jeconias Singleton was, at the time of signing and publishing the will, of unsound mind and memory; or that he signed, executed and published the same under the influence of an unfounded and insane aversion to his son William; or that it was procured to be executed

and published by the fraud, under influence and impor-
tunity of the said defendants, or some of them, they
will reverse the decree, and give the parties another op-
portunity to make that plain which is obscure—that
certain which is doubtful.

In novel and important cases new trials can never
operate injuriously.  The more a subject is investigated,
the better is it understood, and  the greater is the pro-
bability of obtaining justice.

The authority vested in Courts of law to order new
trials, was not intended to be a mere formal, barren
and inoperative power.  It was intended, on the con-
trary, to supply a salutary guard against the mistakes,
passions, prejudices, and ignorance of juries.  The Judge
was not designed to be a mere automaton, to register
the verdicts of juries in all cases, against the manifest
justice of the case, and against his own convictions of
right.  The law supposes that he will exercise an effec-
tive, scrutinizing and controlling judgment.  Nor does
the fact that there has been evidence submitted to the
jury, on both sides of the points at issue, exclude the ex-
ercise of this beneficial power of supervision.  If it did,
no matter how weak the testimony on one side was,
and how strong on the other, the Judge would be re-
strained from interference, notwithstanding the verdict
was manifestly against the weight of evidence.  If such
a rule were adopted, litigants would be sure to accom-
modaté themselves to it, by introducing mere formal, if
they could command no better evidence, to oust the au-
thority of the Court.

What then is, and ought to be, the rule governing in
cases of conflicting proof?  If the Judge conscientiously
believes that the verdict is against the truth of the case:
that is, contrary to the weight of the evidence, he is
bound to grant a new trial.  His conscience and his
duty should not be satisfied by ingenious speculations
on the possible mode by which the jury arrived at the
conclusions which they reached; but require of him to
ascertain if those conclusions are the natural, probable
and logical conclusions from the testimony.  He should
ask himself—would I have rendered such a verdict upon

such evidence? If the evidence is balanced, or nearly balanced; if the character of witnesses be impeached; if the opinion of the judge inclines first on the one side and then on the other, he ought not to disturb the verdict. But if he is convinced that, as a juryman, he would not have found such a verdict, and that it is against the weight of testimony, it is respectfully conceived, that in all such cases it is the manifest duty of the Court to grant a new trial. Otherwise, the power of Courts over verdicts is a mere delusion and a mockery. And the exercise of the power, in the cases supposed, should be attended with the less hesitation, because it merely submits to further consideration, to more thorough investigation, to a re-trial of the matters in issue. To sanction the verdict is to consecrate injustice, if it has been perpetrated, and may be the ruin of the injured party. To set it aside, leaves the successful party still a fair opportunity to obtain another verdict, if justice really be on his side.

If the rules have been correctly laid down which should govern inapplications for new trials, as they are sincerely believed to be, it will appear in the sequel, that, an the main question, that is the actual state of the testator's mind at *the time of executing and publishing* his last will and testament, there is not a particle of proof to impeach the will. The evidence relating to his alleged incompetency, refers to the condition of his mind *prior*, and most of it *long prior*, or subsequent, to that epoch. It will further appear that the imputed insane aversion to his son William, was not irrational, unnatural or insane; but, on the contrary, was such as would have been excited in the breast of any parent, under all the circumstances disclosed. It will, at all events, clearly appear that, if no discrimination whatever is made as to dates and periods, there is a vast preponderance of evidence, proving the competency of the testator. Assuming the first ground here stated to be correct, the verdict was against evidence; and assuming the last, it was against the *weight* of evidence. In either case, the legal consequence is the same.

But to proceed to the main question in this cause.

Does the testimony establish the grounds relied upon to overturn this will? I affirm that it proves a negative.

That the *whole evidence* may be presented to the mind fairly, I will give a synopsis of it.

Benjamin Taylor, in his deposition, which was taken at Lexington, and may be seen at page 97 of the record, speaks of his state of feeling and temper of mind, towards his sons but does not say one word about unsoundness of mind, except in the closing answer in which he replies—"I was but little with him for a year or two previous to January or February 1835; from that time to the latter part of that year, I thought he gave repeated *indications* of unsound mind."

The Court will not *forget* that Ben. Taylor is the full nephew of Mrs. Singleton, and palpably *betrays* all the predilections and aversions of his aunt in the foregoing deposition. Take his first response—"I have been intimately acquainted with the late Col. Jeconias Singleton, of Woodford county, from my childhood, and was repeatedly requested by him to write his will within a few years previous to his decease, and before the date of his will; which I was disinclined to do, and evaded from a conviction, that he was a large portion of the time in a *state of mind or temper* to do injustice to some of his children in making a will; having, at different times, taken great pains, to reconcile him to each of his sons, John, Lewis and Elijah, against whom he appeared much incensed, and towards whom he expressed himself as I thought, in terms unnatural, as a father towards a child. My opinion was that he was so large a portion of his time in that state of *feeling or temper* towards some of his children, that whenever he made a will (if ever) some of his children, according to the humor he might be in at the time, would be cut off from participation in his estate."

You now have the *whole of Taylor's deposition.* I appeal to this Court to know whether he has said one word which touches the issue! He positively says that he had not seen the testator for *two years prior to January or February*, 1835. The will was made in May, 1834. He had not seen Col. Singleton for eighteen months be-

fore he published his will. How is it possible that he <span>Spring Term</span>
can give any account of his state of mind when he <span>1839.</span>
signed, executed and published his will. <span>*Singleton's Will.*</span>

Taylor shows a disposition to have *made* a will for
Singleton, rather than *written* one.

The above is Taylor's entire evidence, when left to
detail without any prompting. But he appears a few
weeks afterwards in Court, and is plied by lawyers.
He then says his reason for not writing Col. Singleton's
will was, that he believed he would make an *unjust will.*
He went over his former statements, and added a good
deal about his thoughts of the testator's mind, and said
he would frequently *invite himself* to the houses of his
relations about Versailles, and suddenly take offence
without known cause, and go home with his wife. But
the portion of his testimony which appears to make the
deepest impression on the Court is the following—
" Lewis asked me if it was possible, I thought his father
ought to make a will in which he should make an equal
distribution of his property, and that he Lewis thought
that his father ought not to make an equal division of his
estate." This is but a *sentiment* expressed by Lewis to
Taylor, and such an one as every *discreet* man would en-
tertain. There is nothing indicative in it that Lewis
had, did, or would exert an *undue* influence over his fa-
ther. The distribution which the testator made of his
estate, and which was the accumulation of half a centu-
ry's toil and economy, was not only rational, but emi-
nently judicious. The three sons to whom he devised
the most of his property, all had large families. His
daughter, Mrs. Brown, was in easy circumstances, about
forty five years old, and had never had a child, and was,
at the time the will was made, laboring under an incur-
able disease, of which she has since died. His daughter,
Mrs. Rust, had left an only child, who, in the opinion of
her grand father, was unfortunately attached to a Mr.
Ford. He gave to her two thousand dollars—provided
she would not marry Ford. In all this, the complain-
ants even can find nothing of insanity.

But William, Ah! William—an old bachelor, upwards
of thirty three, with a strong attachment to a negress

must not be *pretermitted*, under the pain and penalty of destroying the whole will.   If ever Col. Singleton did a righteous deed, it was in disinheriting William.   He was guilty of illicit cohabitation with his father's negro woman, whilst he was a member of the Baptist Church, with his father and mother.   Who can think without loathing, of a man's coming from the polluted embraces of a negro wench to the altar of the living God!—I make the assertion with the full confidence, I can demonstrate it.   William was arraigned before the Church for the offence; he had incurred his father's malignant ire, and caused him the most poignant sorrow, from the alleged intimacy.   William had every incentive to urge him to the inquiry, and the means and opportunity, to make the discovery as to the paternity of Harriet's mulatto boy. There were the old master and mistress and William and all the negroes to watch Harriet, and none of them ever saw a solitary circumstance to induce a suspicion as to any one else.   The old lady, neither in her long deposition, nor evidence in Court, attributes paternity to any one.   The old man never suspected any body else. No negro charged any other man with visiting Harriet. Neither has *William insinuated* that he thought some other was the father.   Is it practicable that another man could have had such intimacy with the woman, and eluded all suspicion!   I think not.   The history or tradition of the human family shows not an instance of the kind.   I therefore repeat that, there is not a *doubt* that William is the father of Harriet's mulatto boy, and that I as firmly believe it as Jeconias Singleton did, from the testimony in this cause.

But if he were innocent, it gave rise to other causes of offence on the part of William.   And even if he had been the most loyal of sons, he was sufficiently provided for.   He has no family; but has land and negroes and every thing, which to *him* can impart a pleasure of life. What good then can result from fixing a stigma upon the memory of Col. Singleton, Lewis, John and Elijah—all of whom have many boys and GIRLS just coming into active and useful life—by declaring the first a madman, and the others fraudulent and traitorous?

George Blackburn, the pastor of the Church in which
William and his father had membership, said—"I have known Col. Singleton since I was a boy, and particularly for the last ten years.  In his ordinary matters, he appeared to be sound in mind; on certain subjects I was and am of *opinion* he was insane." He then gives a detail of what he calls harsh and unnatural feelings towards William, and violent passions when speaking about him, and an account of the trial before the Church. This is the substance of his testimony: see it at pages 115 to 118.

As to the opinion of witness, *Williams*, 1 vol. page 18. "It is necessary for the Court to rely but little upon mere opinions, and look at the grounds upon which opinions are formed, and to be guided in its *own judgment* by facts proved and acts done, rather than by the judgments of others?"

This rule of investigation has been adopted by the present Court, in numerous cases; and I therefore suppose it will govern in this cause.  Blackburn's opinion is entitled to no weight; and his ravelation of facts to just as much as it may prove.  His whole statement amounts to only this—that Col. Singleton evinced harsh conduct, sudden bursts of passion, unkind and unnatural feelings, in his opinion, towards William.  Admit that he did, and it does not prove any thing in relation to the issue, because they are matters which do not enter into the question of insanity.

See *Williams*, 1 vol. page 25.  "But she must understand that no course of harsh treatment—no sudden bursts of violence—no display of unkind, or even unnatural feeling, merely, can avail in proof of her allegation—she can only prove it by making out a case of antipathy, clearly resolvable into mental perversion; and plainly evincing, that the deceased was insane as to her, notwithstanding his general sanity."

An author of universally acknowledged correctness gives the rule more explicitly.  *Chitty's Medical Jurisprudence*, 355.  "The circumstance of a person evincing the most harsh conduct, sudden bursts of passion, or of display of unkind or unnatural feeling towards a child,

WITHOUT ANY CAUSE, will not of themselves establish insanity; so the proof that a person had given way to the supposition that he had actually seen an apparition, we have seen is not legal evidence of insanity, but only of weakness or imbecility, perhaps attributable to temporary weakness, or ill health. Nor will proof of great excentricity establish insanity."

Blackburn, the pastor, swears—" In his ordinary matters he appeared to be sound in mind." The authorities just cited which are based upon numerous adjudications therein referred to, condemn the other matters proved by him, as insufficient of themselves to establish insanity. He said he thought Col. Singleton insane on Religion, and gave as a proof of his opinion, that he said the Campbellites would sap the foundation of the Christian religion. This I am sure no sane man would consider insanity, for it was the opinion which the *pastor himself* held. There is nothing in religious faith or practice which can establish insanity. The Jew, the Bramin, the Mahomedan, the Catholic, the Puritan, the Shaker, the Infidel and Mormonite, are all equally sane. The pastor in fact proved nothing; except that Colonel Singleton would not do exactly as he wished him to do, and therefore he thought he was a madman. " In his ordinary matters he appeared to be sound in mind."

Next is Mrs. Singleton's evidence, to which so much importance is very undeservingly attached. It is true she details many freaks of conduct in her husband—some absurdities, and a few fantasms. Does she prove any act which demonstrates that her husband had not the ordinary command of intellect over all the affairs of life in which he acted a part? I aver, she does not.

You have already seen in *Chitty's Med. Jurisprudence*—a work compiled from the best sources, and with the greatest care and ability—that the belief, a man "had *actually* seen an apparition" is not legal evidence of insanity, page 355. What then becomes of the old woman's story of his belief that persons surrounded the house to kill him; that others pursued him to take him to the lunatic asylum? They are things possible, and belief in them does not carry as strong evidence of de-

Spring Term
1839.

Singleton's
Will.

rangement as belief of actually seeing a ghost; yet the proof of the latter is held not to be legal evidence of insanity. There is nothing in the erratic and eccentric course of conduct which she ascribes to him, that is recognized by the laws as legitimate testimony to fix upon him any kind of insanity. See *Chitty's M. J.* 355. 1 *Williams*, 25.

The Court, in the opinion given, place much consequence upon an item of Mrs. Singleton's evidence: to wit. "I heard John Singleton remark in the presence of the old man, when he was lying on his settee—'do you see the striking likeness of Harriet's child to William'—'the old man exclaimed Oh! Johnny, Johnny?' The use made of this by the Court, is to prove that John intended and attempted to prejudice his father against William. It could not have been so intended nor had it such an effect. The old man reprimanded John for the expression; and if his feelings were excited, his displeasure was directed to John instead of William.

There is another portion of the old lady's statement used to prove that the defendants exerted undue influence over the father in making the will—to wit. " His sons had a very great influence over him. The boys, all but William, when they came to see us, would ask if William had quit drinking yet; and that the old man had better give his property to them: they had families and children, and William had none." Is it possible to torture this into an exercise of improper influence! She affirms they had influence; but she does not say they *practised* it upon their father to induce him to make the will. This Court said in Elliott's will, 2 *J. J. Marshall*, 343—"But there is no proof that William Elliott, junior, exercised any influence, which the *ascendency* he had acquired rendered possible, in controlling his father and inducing him to dispose of his property by the will, contrary to his settled inclination and judgment. Such undue and improper influence must be *exercised and proved.*" The witness does not undertake to say that they *exercised* undue and improper influence over him.

But impotent as her evidence is, to establish derange. ment on her husband, and fraud upon her sons—she de-

tracts much from its effect by her own declarations. She says at the time her testimony was taken, "I am now seventy three years of age, and it cannot be expected of me to answer every question put to me by you. I have heard the old man say he had heard Billy had cursed him. I do wish the will should be broken. He drank amazing hard at times."

The foregoing extracts show that the witness was further in the wane of life, than her husband. She was a year older. She was subject to all the imperfections and infirmities of age. She proves her husband was *apprized* of the curses heaped upon him by his son William. And it is respectfully supposed that the Court have not given due weight to this portion of the evidence, which exhibits clearly that the *Testator had knowledge* of the vulgar revilings of him by his son William; and with proper deference, it is conceived that the Court have not bestowed sufficient consideration to the fact that the witness was prompted by strong desires to have the will broken, and that the old man's erratic and frantic and fantastic conduct proceeded from having "drank amazing hard."

The testimony of a witness under such circumstances, even if the facts were legal evidence, ought to be received with great caution, and applied with much circumspection.

The court have drawn a conclusion from Mrs. Singleton's testimony, that the devisees *exercised* influence over the testator, although the law requires it should be *proved* and not *infered*. She shews that she endeavored to induce him to make a will different from the one which he did make. When the testator spoke of making his will, at different times, she states—"I said to him let the whole be equal." He said, "no, William shall have no more of my property." Here was clearly an attempt to influence him, by his wife, with whom he had lived fifty years in perfect harmony—in poverty and riches—in joys and sorrows—an entire community of feeling through the variegated scenes of life; yet *she failed.* How then can you believe for a moment that his sons did or could control him? Ben Taylor proves he was

at times displeased with all his sons; but no witness has said that ever there was a jar between him and his wife.

Col. Singleton was a man of fixed purposes, independent in his sentiments and judgment, not to be influenced by wife, children, or friends. This, George Blackburn, the pastor, and all the other witnesses who speak on the subject prove beyond a doubt. He was the last man that ever lived who could be subjugated to the wishes of another. How few such men!

Mr. Hedger expressed the *opinion*, Singleton was deranged because he frequently changed his feelings towards his sons, and that he fell out with him about some work, and wanted to pay his charge of $2 with fifty cents. This is a fair exposition of his testimony. See page 126 of the record. Is it possible to elaborate insanity from such futility!

Mr. Jessee, "I have known Col. Singleton for a number of years, and upon the subject of his son William I did look upon him as a madman. The old man said to me, *William had talked wrong of him. This took place in* 1832 *or* '33. I believed him deranged, and his aversion to his son William was so great that he was insane."

This witness says not a word of Col. Singleton in all the affairs of life, save this controversy with William, and his *ill treatment* of him as he believed. First: I will again remind the court that Mr. Jessee proves that Col. Singleton had knowledge of William's abuse of him in '32 or '33, as above quoted, and the will was made in May '34, so that two of the complainant's witnesses, to wit: Mrs. Singleton and Mr. Jessee have proved the testator had knowledge of William's abuse of him, which the *Court appeared to overlook or forget.* The balance of Jessee's evidence relates exclusively to the harsh conduct of the testator towards William, touching this particular transaction with Hanriet. To which I will reply in the words of the most famous jurist now living, "The circumstance of a person evincing the *most harsh* conduct, sudden bursts of passions, or of display of unkind or unnatural feeling towards a child, *without any*

*cause*, will not of themselves establish insanity." See *Chitty's Medical Jurisprudence*, 355.

The testimony of Mr. Allen, another witness brought forward by the complainants, I will give you as taken down by their counsel, and certified in the record. See page 128.

"I lived with Col. Singleton in the year 1833. I do not think he was deranged. In the fall of that year (1833) Mrs. Singleton called to me one night to get up: that Col. Singleton had got up and gone out, and had been out some time. Witness got up, and when he went out he found Col. Singleton lying on his back in a sink hole, in the *orchard*, without any clothes except his shirt, with his *gun* in his hand. I passed by him without speaking, and returned. I thought he *managed things on his farm very well*, and I was much pleased with him as an employer. I have seen him *mad*, but I did not think him *crazy*. I never saw William on the place. I have heard William singing about the place. The old man sent for me on one occasion in the field, and said that William was there with his gun, and threatened to shoot him or some of the hands. I came, and *saw William with his gun*, but he said nothing to his father or me. I always thought Mrs. Singleton a kind affectionate mother and wife, none more so. William appeared composed. The old man appeared to be apprehensive that William would kill him or his hands. There was a slip of timber between the old man's farm and William's, 150 yards broad. William was on his own place at the time."

Here is their own witness, who lived as an overseer with the testator, during the year '33; slept in the same house; eat at the same table, and labored in the fields with him; received orders every day from him, and almost every hour communicated with him, was placed in a situation which above all others enabled him to ascertain the state of his mind, his qualities and properties of character, yet he *"did not think he was deranged. He had seen him mad, but did not think him crazy. He thought he managed things on his farm very well."* How is this tesmony to be annihilated? They produced it. The wit-

ness has no *wish* to break or sustain the will, as Mrs. Singleton says she has. Allen's evidence alone dispels all the machinations against the will.

The testimony of Mr. Christopher and Mr. Sullivan may be noticed at once. Their statements are of the same kind and character—I have no doubt were compared before they were made. They both date their observations of Col. Singleton's conduct in the year 1835. See pages 129–'30 of the record. Their whole nonsensical narrative ought to be excluded from this cause upon the following legal rules: First, "until proof of an habitual insanity is made, the presumption is that the party agent, like all human creatures, was rational." 1 *Williams*, 18. There is no proof in the cause that the testator was habitually insane; on the contrary, in the general, he was perfectly sound. They speak of no act anterior to the 17th of May, 1834, when the will was made, and therefore, their evidence ought to have no consideration on this rule. Second. "It is not every man of an idle, frantic appearance, and behavior, who is to be considered as a lunatic, either as it regards obligations or crimes; but that he must appear to the jury to be *non compos mentis*, in the legal acceptation of the term; and that, not at any *anterior period*, which can have no bearing upon any case whatsoever, *but at the moment* the contract was entered into, or the crime committed." *Chitty's Med. Juris.* 359. See 1 *Henning and Munford*, 476–7–8—same doctrine recognized. If testimony at an *anterior* period to making the will can have no bearing on the case whatever, with stronger reason would evidence of an idle, frantic appearance and behavior at a *posterior* period, have no bearing, for they do not pretend to have criticised his conduct until 1835—the will bearing date 17th May 1834.

It is said in the opinion, that it is not practicable to have the evidence as fully before this court as it was presented to the jury; and sorry am I that it is so. For if these two witnesses had been here in person, much labor might be saved. Their almost incomprehensible story, after being put in form and figure by counsel, has lost its manner and countenance. A couple of syco-

phantic loungers—bottle companions of William, sent
on an embassy of reconciliation between father and son.
What mockery!

Mr. Hurst, the last witness for complainants, and to
whose testimony the Court have alluded, I will give al-
together, because of the allusion.

"John Singleton came to me, and had a copy of the
old man's will, and said he wished the will was *burst*;
that it ought to be broke, and if it was broke *they would
all be equal*; and said that if some things were known, he
did not know what might happen." See record, page
131.

What is in this whole statement which elucidates the
issue? Did John say his father was crazy when he made
the will; that the defendants had influenced him to do
it; or that he had an insane aversion to William? No,
he said neither. But he expressed a wish that the will
might be broken, and that would make them all equal—
Lewis having got the largest devise. He made a dark
insinuation—that if some things were known—he did
not know what might happen. These statements are
not admissible under the issue formed. "With regard to
the proof of insanity, as the imputation is contrary to
the natural presumption of adequate intellect, the defect
should be established by direct and positive evidence,
and not by mere probable or conjectural proof." *Chit-
ty's Medical Jurisprudence*, 354. But suppose John Sin-
gleton had made a direct and positive admission of eve-
ry fact put in issue—*those admissions* would not be admis-
sible, because there are co-defendants whose interest
cannot be impaired by any thing which he may do or
say. He spoke to Hurst, not upon oath, and therefore,
the evidence proved nothing against his associates. Sup-
pose William, Brown and Ford had promised John one
half of their interest if he would acknowledge the whole
ground of controversy, and he had made acknowledge-
ment before witnesses—would any jurist huzard his rep-
utation, by admitting the proof of the acknowledgement?
Upon the same principle, ought the statement of Mrs.
Singleton, as to John's confession, be excluded from con-
sideration by the court. In 7 *J. J. Marshall*, 267, I read

—"The confession of one co-defendant cannot prove that another aided or abetted him in the perpetration of an imputed wrong. The admission of such testimony for such a purpose would be inconsistent with the first principles of proof in courts of justice." See *Sel. Cas.* 497. But still more in point—"Evidence of an opinion expressed by one of the devisees in a will, that the testator was not of sound mind is not admissible to prove insanity, &c." *Phelps & al.* vs *Heartwell*, 1 *Mass. Rep.* 71. What then becomes of John's opinion, expressed to his mother and Hurst, and so much relied on by the Court! Suffer me to hope *this Court* will not base an opinion in part on testimony which reason and law concur in pronouncing spurious.

Having surveyed all the evidence given in by the complainants, without reference to a syllable of what was proved by the defendants, I might appeal to this tribunal, with entire confidence, for a decree in favor of the will.

First: the complainants took upon themselves the burden of proving that, at the time will was signed and executed and published, the testator was of insane mind and memory, and under the influence of an unfounded and insane aversion to his son William; and that he was acted upon by fraud, undue influence and importunity of the defendants.

Where is the witness who has spoken of the state of his mind on the 17th day of May, 1834? Who amongst the witnesses proved that either of the defendants induced him to make the will? Which of them proved a solitary act in all Col. Singleton's energetic and useful life, that is recognized by law as *admissible* to establish insanity? I challenge the production of an *act or expression* of the testator, by any and by all the nine witnesses for the complainants, which is not condemned as spurious evidence to establish insanity, by the following law,—"It is not every man of an idle frantic appearance and behavior, who is to be considered a lunatic, either as it regards obligations or crimes; but that he must appear to the jury to be *non compos mentis*, in the legal acceptation of the term, and that not at any *anterior* period,

Spring  Term
1839.
*Singleton's
Will.*

which can have no bearing upon any case whatever, *but at the moment* when the contract was entered into, or the crime committed." *Chitty's M: J.* 359.  "But she must understand that no course of harsh treatment—no sudden bursts of violence—no display of unkind or even unnatural feeling, merely, can *avail* in proof of her allegation—(she alleged the testator had an insane aversion to her—) she can only prove it by making out a case of antipathy, *clearly* resolvable into mental perversion, and plainly evincing that the deceased was insane as to her, notwithstanding his general sanity." 1 *Williams*, 25. The circumstance of a person evincing the most harsh .conduct, sudden bursts of passion, or of display of unkind or *unnatural feeling towards a child without any cause*, will not of themselves establish insanity; so the proof that a person had given way to the supposition that he had actually seen an apparition, we have seen is not legal evidence of insanity, but only of weakness or imbecility, perhaps attributable to temporary weakness or ill health.  Nor will proof of great eccentricity establish insanity." *Chitty's M. J.* 355.  Until the foregoing law shall be nullified, the complainants have wholly failed to make out their case.

But as "there is a glorious uncertainty in the Law," I will proceed to prove the converse of their propositions.

As the issue in this case, refers to *the time at which the will was made* as the true period of soundness, and if the issue did not, *the law does*—see *Chitty*, and 1 *Hen. & Mun.* .as before cited—I will claim the attention of the Court to the evidence of the subscribing witnesses to the will. Samuel Wilson, a lawyer by profession, about forty years of age, and of the first respectability, states— "That he had been intimately acquainted with Jeconias Singleton, the testator, for ten years preceding his death, and had transacted his law business for him during that period, and frequently conversed with him, *on a great variety of subjects, taking much pleasure in hearing him talk.* In the spring of the year 1834, he came to him in the town of Versailles, and told him he wanted to make a will, and that it was his wish that he should write it for him, and requested the witness to name a day when he

would be at home—the witness having removed from the town to the country. A day was appointed—about three weeks afterwards, upon which the testator came, in the evening, and after supper, the witness and testator discoursed in relation to the subject of the will and the disposition of his estate, for a considerable time, when the witness prepared to write the same, and proceeded to draw the will, so far as provision is made for the wife of the testator, and it then being usual bed time, the witness proposed to retire which was done. Next morning, when witness got up he found the testator up, and he remarked that, in reflecting upon the manner in which he intended to devise his estate, he was induced to change it. He had determined after the provisions for his wife, to give the balance of his estate to his grand children, but he feared it would free them from obligations to their parents, and might render them disobedient. He concluded to suspend further progress in his will to enable him to come to a more satisfactory determination, and a subsequent day thereafter was appointed, about ten days, on which he returned. The will was then written so far as relates to devises to particular individuals, when he said he was not entirely satisfied as to the disposition of the residuum, and the appointment of executors, and that he would take time for reflection on both. A day was then set, upon which he returned, and the will was then completed. When the devise was made to William, the witness was surprised, and turned his eyes from the paper upon Col. Singleton, the testator, without saying a word to him. He remark- that he supposed the witness had heard of the *unhappy difficulty* which had for some time existed between him and William. The witness replied that he had not heard any thing of it. The testator then said—"never was a father so badly treated by a son, as I have been by William. I am afraid now to go about my place. I have seen him lying in the corner of the fence with his gun to shoot me—*he has run my hands out of the field.*" He said no more, and the witness made no reply, and proceeded to write on the matters contained in the will. The testator gave the witness the boundaries of the

tracts of land and amounts of advancements to his children. When the will was finished, he asked the witness to send for some neighbor, who in conjunction with him might witness it; but that he wanted a witness who could be trusted with a secret of that kind, he did not wish it to be known that he had made a will; if it were, it might cause disturbance in the family, for he believed that none of them would thank him for what he had given them, or be satisfied with his will. The witness replied that he did not know of any one that could likely be produced just then, that the testator had best take the will home with him, read it over at his leisure, reflect on it, and when he was fully satisfied, sign it, and have it witnessed. The testator concluded to do so, and suggested George M. Pinckard, a merchant of Versailles, who inhabited a house of his, as a suitable person to witness his will. A day was then fixed, upon which the witness was to meet the testator at the store of the said Pinckard, and on the coming of which, the witness attended at the store of the said Pinckard, and had been there but a few minutes before the testator came. When the testator came Pinckard and witness were talking at the counter. The testator beckoned to Pinckard, and they went into the counting room, and the witness followed. The business was made known, and they all went up stairs; the will was taken from the testator's pocket, he expressed himself satisfied with it, and he then signed it, and it was witnessed. The will was then deposited with witness, for safe keeping, under strict injunction of secrecy. The testator and witness frequently met afterwards and conversed, and some two or three months after making said will, he expressed a wish to alter the will, so as to give his three storied brick building in Versailles to his son Lewis, and his two storied building to his son John—the first at four thousand dollars, and the second at three thousand dollars; but came to the conclusion that it was not necessary as they could divide amongst themselves, or buy if they wanted them. At the June Court preceding his death, he stated to witness, that he had lately purchased some land for John, and that he wanted to alter his will.

*Witness* asked him if he wished to revoke the will he had in his possession. *He replied by no means; that it must stand, he had been too long without a will.* He only wished to make a small alteration for John's benefit, and if he never came to have the alteration made the will must stand. At the September term of the Woodford Court preceding the testator's death, he came to witness, and said, there is a prosecution against my son William, for improper treatment to his slaves, and he is below, and requested witness to go into court and get him clear of it—and asked what fee, and being told, said he would pay it; that ☞William was his son, although he had treated him very badly. The witness stated that during his whole acquaintance with the testator, the time of consultation and deliberation touching the will, and the interviews with him afterwards, he neither saw nor heard any thing whatever the least indicative of mental derangement, and that *he verily believed that testator was of as sound mind and disposing memory when he made the will, as any man of his acquaintance.*" See record pages 131 to 135.

George M. Pinckard the other subscribing witness to the will deposes—"I am one of the subscribing witnesses to the last will and testament of Jeconias Singleton, deceased. Said Singleton in company with S. Wilson, Esq. called at my store in Versailles; one of them remarked that they wished to see me in private. I took them to a room over my store, when I was informed that their business with me was to witness the signature of said Singleton to his will. The paper purporting to be his will was produced, signed and witnessed. I was requested to say nothing of what had transpired, as said Singleton was desirous that the fact of such will being made, should not be known. The will produced in the county court, and sworn to by me, is the one above named, and the only one I ever witnessed. The will referred to is dated the 17th day of May, 1834. I further state that, we were in the room but a very short time; there was little said by any of the parties, and nothing to produce a belief other than that it was a deliberate and preconcerted matter—the will having been

previously written, and only produced for signing and witnessing, *being then declared by said Singleton to be his will.* My acquaintance with Mr. Singleton commenced in 1823, and continued to December 1835. For the first two years of our acquaintance, I was often with him, from the fact of living in one of his store houses. After that period to the fall of 1826, my intercourse was very limited, not transacting any business, with him. From the fall of 1826, until that of 1830, I again occupied a store house belonging to him, and I presume, within that time transacted a large portion of his business. From the fall of 1830, to December 1835, my intercourse with him was limited—not having any business transaction with him, or more intercourse than the usual civilities with an old friend and acquaintance; and within the whole period of my acquaintance with him, I discovered no change whatever, as it regarded his capacity for business." See record pages 136–7.

There is no witness on either side, who knew any thing which transpired about the particular time the will was made, save the two subscribing witnesses, who prove perfect soundness of mind and freedom from passion and influence of any kind. What is the judgment of law under such a state of case? I will give the law itself. "If a lunatic person have clear or calm intermissions (usually called lucid intervals,) then, during the time of such quietness and freedom of mind, he may make his testament. If you can establish (said Sir Wm. Wynne, in the case of *Cartwright* vs. *Cartwright*,) that the party afflicted habitually by a malady of the mind, has intermissions, and if there was an intermission of the disorder *at the time of the act,* that being proved is sufficient, and the general habitual insanity will not affect it." 1 *Williams,* 17.

That the old man Singleton had lucid intervals is even proven by Mrs. Singleton, up to the day of his death. See record, page 125. She says—"For the last two or three years of his life, he did not attend much to his business. *He was some times in his mind, and would talk as well as any person,* but at other times he would be flighty." Here is the testimony of the Her-

cules witness—she who was so *desirous* to break the will—proving that "he was sometimes in his mind, and talked as well as any person."

I appeal to the Court to know whether Wilson and Pinkard have not proved that Singletom was, at the time he made his will, in a lucid interval, or, as Mrs. Singleton describes it, 'in his mind, and could talk as well as any person.' Wherefore, if all the witnesses on both sides had proved that he was habitually insane, Mrs. Singleton having established that he had lucid intervals, and Wilson and Pinkard having shown, beyond all doubt, that he made the will in one of them, there can no longer be a scruple as to its validity.

To show the weight and influence which *the law gives* to attesting witnesses, I will make one quotation.

" The law has placed subscribing witnesses about the testator to ascertain and judge of his capacity." *Hayward* vs. *Hazard*, 1 *Bay*, 335; *Chase et al.* vs. *Lincoln*, 3 *Mass. Rep.* 237. They therefore may testify as to the opinion they formed of the testator's mind at *the time of executing the will. Pool et al.* vs. *Richardson*, 2 *Mass. Rep.* 330."

" The fact that the will is a sensible one, provided it can be completely proved that the party who made it, framed it without assistance, affords a presumption that it was made during a lucid interval. *Godolph*, 25. Swinburn observes—" if a lunatic person, or one that is beside himself at times, but not continually, makes his testament, and it is not known whether the same were while he was of sound mind and memory or not, then in case the testament be so conceived, as thereby no argument of phrensy or of folly can be gathered, it is to be presumed that the same was made during the time of his calm and clear intermission, and so the testament shall be adjudged good; yet, although it cannot be proved that the testator useth to have any clear and quiet intermissions at all; yet, nevertheless, I suppose that if the testament be wisely and orderly framed, the same ought to be accepted for a lawful testament." *Starkie*, 1710–11, and note f.

" It is by no means necessary to show that a testa-

tor who had once been deranged had, at the time of making the will, regained all the powers of mind which distinguished him before the malady; all that is essential is, that he should be restored to a disposing mind, *capable of doing an act of thought and judgment.*" *Starkie*, 1712.

Let me call the attention of the Court to a passage of law which I am sure must put to rest forever all objections to this will.

" But a testamentary paper cannot be set aside on the ground of MONOMANIA, unless there be the *most decided evidence that, at the time of the factum* or signing the paper, the belief in the testator's mind, not only amounted to *insane delusion*, but was also *connected with*, and probably *occasioned by*, the continuing delusion. But if there were actual ground for *suspicion* of an injury, though in fact *not well founded, and disbelieved by others, the misapprehension of the facts will not be considered mental delusion, and a will made by the party affected by such suspicion, may be valid.*" *Chitty's Medical Jurisprudence*, 352.

Can there be any doubt that there *was actual ground for the old man to suspect* that Harriet's child was begotten by William? If so, although disbelieved by others, and not in fact well founded, yet, his misapprehension of the facts will not be considered *mental delusion*, and his will, made whilst he was affected by such *suspicion*, *may be valid*.

The authority is so reasonable, and so directly in point, and the Court not having intimated in the opinion, ever having seen such authority, and basing their arguments upon very different principles, and it being entirely a novel case in this Court, and one which involves a great amount of property, and that which is far more precious—character, it is hoped that the Court will hear another argument of the cause.

But while considering the clear, unequivocal, and satisfactory evidence of the subscribing witnesses to the will, I cannot forbear to give another authority more explicit still, notwithstanding the many which have already been given, and the protracted length of the petition.

" It appeared the testatrix early in life was afflicted with a disorder of the mind. She was attended by Dr, Battie, who desired the nurse and other servants to prevent her from reading and writing, as such occupation might disturb her head; and in consequence thereof, she was for some time kept from the use of books, and writing materials; however, some time prior to writing the will, she became very importunate for the use of pen and paper, and frequently asked for them, in a very clamorous manner. Dr. Battie, in order to quiet and gratify her, consented that she should have them, telling her nurse and other servants, that it did not signify what she might wright, as she was not fit to make any proper use of them. As soon as Dr. Battie had given permission, pen, ink and paper were carried to her, and *her hands, which had been for some time kept constantly tied, were let loose.* She sat down at her bureau, and desired her nurse and servant to leave her alone while she wrote. They went into an adjoining room, and watched her. At first she wrote upon several pieces of paper, and got up in a wild and furious manner, and tore the paper, and threw them into the fire, one after another; after walking up and down the room many times, in a wild and disordered manner, muttering to herself she wrote the will. She enquired the day of the month, and an almanac was given to her by one of the nurses, and the day pointed out to her; she then called for a candle to seal the paper, which was given to, and used by, her for that purpose, although they used generally to be cautious not to trust her with a candle, and were forced to hold it at a distance from her, if she read the newspaper. The survivor of the two witnesses to the transaction, deposed that, in her opinion, the testatrix had not then sufficient capacity to be able to know what she did; and that during the time she was occupied in writing, which was upwards of an hour, she, by her manner and gestures, showed many signs of insanity. The will was written in a remarkably fair hand, and without a blot or mistake in a single word or letter; and it was a proper and natural will, and conformable to what her affections were proved to be at the time,

and her executors and trustees were very discreetly appointed. Two months after writing this will, in conversation with the mother of the parties benefitted by the will, the testatrix mentioned that she had made such a will, and ordered her servant to bring it, and she then delivered it to the mother, observing that there was no need of witnesses, as the estate was all personal, and the will in her own hand writing. Sir Wm. Wynne pronounced the will to be the legal will of the deceased; and further said that, in his apprehension, the forming of the plan, and pursuing and carrying it into effect, with propriety and without assistance, would have been sufficient to have established an interval of reason, if there had been no other evidence; but it was further affirmed by the recognition and delivery of the will. From this sentence an appeal was interposed to the high Court of Delegates, who affirmed the judgment of Sir Wm. Wynne. The very eminent Judge, in the course of giving sentence below, after remarking that the Court did not depend on the opinion of the witnesses, but on the facts to which they deposed, delivered the following observations. The strongest and best proof that can arise as to a *lucid interval,* is that which arises from the act itself of making the will; that I look upon as the thing to be first examined, and if it can be proved and established, that it is *a rational act rationally done, the whole case is proved.* What can you do more to establish the act; because, suppose you are able to show the party did that which appears to be a rational act, and it is his own act entirely, nothing is left to presumption in order to prove a lucid interval. Here is a rational act rationally done. In my apprehension, where you are able to establish that, *the law does not require you to go farther.*" 1 *volume Williams on Executors,* 20-1.

Again: Lord Chancellor Eldon mentioned that he had been concerned as counsel in a cause where a gentleman, who had been for some time insane, and who had been confined till the hour of his death in a mad house, and had made a will while so confined. The question was, whether he was of sound mind at the time of making this testament. It was a will of large contents,

proportioning the different provisions with the most pru-
dent and proper care, with a due regard to what he had
previously done, to the objects of his bounty, and in
every respect pursuant to what he had declared before
his malady, he intended to have done. *It was held that
he was of sound mind at the time.*" *Ibid.* 22.

Here was a woman confined from youth in the mad
house with her hands tied,-who made her will, and the sur-
viving witness swore she gave signs of insanity when she
wrote it, yet it was established as a valid will. But Col.
Singleton was never *suspected* of insanity by his nearest
neighbors; and both the subscribing witnesses to his will
swear, that he was of as sound mind and memory, and
as capable of making a will as any man of their acquain-
tance; yet, *his will* is nullified. Why was the woman's
will established—who had been in the mad house for
years, with her hands tied, and the subscribing witness
swore she gave signs of insanity at the time she wrote
it? Because the will was properly *framed,* and showed
that *the mind which dictated understood the subjects of it.* Is
not Singleton's will properly framed, and does it not
show that his mind, which dictated it, understood the
subjects of it?

It is not contended that it is irrational in disinheriting
Mrs. Brown, although she had been a discreet woman?
Why? Because she was well off, and there was no pros-
pect of her ever having children. It was not irrational
to cut off the grand daughter, who was not rich, and who
in all probability might have children. Why? Because
she was obedient, kind and affectionate to her grand
father, and moreover, persisted in marying a man to
whom her grand father objected. But the disinherison
of the amiable William is demonstration of insanity at
the very moment of dictating the will! Why? Wil-
liam at the date of the will was thirty five years old,
had a plantation and negroes, and every thing that any
farmer-could wish—but had no lawful wife, and no child
except this mulatto boy—had cursed his father outra-
geously, as Hughes proves; and the testator told the
mother, he had heard he had cursed him; and the testa-
tor complained to Jessee, he had treated him wrong;

and Barr proves that he had run him out of the field, and all the slaves, with a gun; and he said to his mother that he would cut his throat if he were not his father— chant anthems in corn-song tones and cadence around his father's dwelling, to let him know, as he told his mother, that he was not at his father's negro quarter; and declared to Hurst that they, that is Hurst and himself, had been associated with damned rascals in the Clear Creek Church—his father being a member and alluded to; and that his father's negro dreamed he went to Heaven, and could not find his master there; and admitted to the Rev. George Blackburn who went in company with JOHN SINGLETON, to William's house, *to recon. cile* the old man and William, that he had said to Lewis, his father was a *damned rascal,* and that too in the year '34, when the will was made! See statements named in the foregoing, for proof of William's harsh, unnatural and *insane* conduct towards his father, more especially the last imputation, at page 118 of the record.

How is it possible for the Court to invalidate Singleton's will, with the case of *McAdam* vs *Walker,* cited by Lord Chancellor Eldon, as herein before referred to, staring them in the face? In that case, the testator had been for some time insane, and confined till the hour of his death in the mad house, and had made his will while so confined. The question was whether he was of sound mind at the time of *making* his will. It was a will of large contents, proportioning the different provisions with the most prudent and proper care, with a due regard to what he had done previously to the objects of his bounty, and in every respect to what he had declared, before his malady, he intended to have done. It was held he was of sound mind at the time. Singleton's is a will of large contents—he proportioned the various devises with *prudence and care,* as his conversation, detailed by the draftsman, at the time, shows; it was in accordance, so far as relates to William, as he had often declared was his intention, both before and after making the will. For the proof, he said to his wife *when she attempted to influence him on the subject of devising his property,* and used this expression—"I said to him let

the whole be equal." "He said William shall have no more of my property." To David Humphreyes he said, when talking upon the subject of making a will and the manner in which he should dispose of his property— "William should never have any more of his estate than what he had given him, alleging he had treated him badly." For first quotation see page 123, and second 139, of the record.

The law, as collected from all sources, and matured by the most enlightened Jurists, and transmitted to us as a guide, shows most clearly that, such cases as Col. Singleton's have frequently occurred, and they have invariably been decided in favor of the testaments. The law never has and never will condemn a man of idle, frantic appearance and behavior, full of prejudice and partiality, and *even adhering to his opinions precociously formed, with eccentric tenacity*, as a lunatic, but rather attribute it to his imbecility. Col. Singleton was certainly not fairly chargeable with any delinquency beyond this. Col. Singleton, from the time of his marriage to the day of his death, lived in sight of Clear Creek meeting house, as populous, respectable and beautiful neighborhood as any in Kentucky, three miles from the town of Versailles; and what does Col. William B. Blackburn, who was almost the whole time a member of one or the other branch of the Kentucky Legislature, and after speaker of each, say of him? "That in 1802, (and not 1812, as the chief Justice quoted,) he settled near to Col. Singleton, and had been intimately acquainted with him since. He had transacted business with him at various times, and on a variety of subjects; had been associated with him in political contests, and never saw any act, or heard any expression of the testator, from which he would infer the *slightest mental derangement*; but on the contrary, he believed he was an industrious, economical and enterprising man. He had also been his attorney and counsellor at law for many years."

Here was an intimate association with a man, for more than thirty years, who presided over public assemblages, frequently canvassed before the people, and whose *trade* it was to become acquainted with every man's weak and

strong points and parts, yet he never discovered the slightest derangement.

Thomas Bullock "had known Col. Singleton for forty years—twenty of which he had lived a neighbor to him, and that during the other twenty he had lived some seven or eight miles from him, had been intimately acquainted with him, and it would never have entered his mind that he was the least deranged. He stated that he had a *great many dealings* with him, and *frequent conversations* on religious and other subjects. He stated that for the last fifteen or twenty years, he had not lived nearer than seven or eight miles, and that his intercourse had been that of a street acquaintance in Versailles, but that he had discovered no *alteration in him.*

Mr. Bullock has frequently been a member of the legislature, and always a leading member of the Church, and a man of fine mind and information.

Doctor Blackburn said, "that twelve or fifteen years ago, he was the family physician of Col. Singleton; but for the last eight years, he had a common acquaintance with him, and had never observed any *symptom of derangement.*"

The family physician, above all other men, ought to know best the state of a man's mind. Col. Singleton had a large family, and a long time; how did it happen that his *malady* was not named by his wife, or some one else of the family, to a physician, and his advice taken, as to his disease, and the method of cure? If his wife had believed that he was insane, instead of *in liquor*, can any man who knows any thing of the human heart, hesitate for a moment in coming to the conclusion that, she would have communicated it to the family physician, the pastor of the Church, *her* nephew, Ben Taylor, or some friend, male or female—being surrounded by a multitude of relations. Neither she, nor any other witness, has detailed that she expressed an apprehension her husband was visited by Heaven's most awful scourge, until the production of the will. Others may, but I never shall have *faith*, that the old lady *determined* in her own mind, that her husband was afflicted with madness, until she learned her *last born* had no share in

the will. Did William believe his father was deranged? Certainly, he did not, or he would not have taunted him by singing round his house; cursed him outrageously to Hughes; he would not, to George Hurst, have "remarked that, he and the witness had been connected with a set of *damned rascals*—meaning the members of the Baptist Church at Clear Creek, in which Col. Singleton was then a member, and William had been, not then. William said many *disgraceful things* about his father, and stated that a negro had told him that he had dreamed that he had died and went to Heaven. and that his *old master was not there.*" See record, page 140. Nor would he have admitted to George Blackburn, when he went to William's house *in company with John Singleton, to reconcile* him to his father, that he had said to Lewis, his father was a *damned rascal.*" See page 118. Nor would he have run his father out of the field with a gun, as stated by Barr. Nor would he have said to his mother, that if he were not his father, he would *cut his throat*—see old lady's statement, page 124—if he had believed for a moment that his father was *irresponsible*, by the act of God, for what he said or did, so far as it regarded him. It is beyond the power of human intelligence to reconcile William's deportment to the old man, with his belief that he was insane. The concurring testimony of two lawyers, (Wilson and Blackburn,) one physician, (Blackburn,) one merchant, (Pinckard,) one churchman, (Bullock,) is that he was a man of unquestionable soundness of mind. Hear what a farmer says. Thomas Helm "stated that he had lived about two miles from Col. Singleton, the last. thirty years, and *known him well.* He made the best crops in the neighborhood, and got the best prices for them, and was a *skilful trader.* He would not have supposed he had an unsound mind. He never viewed him as a great man. He had a great many curious ways, See page 139. The same account—after having known him well for thirty years—that doctor, lawyers and merchants give.

Bernard Giltner, who is a justice of the peace and me-chanic, said "he had been acquainted with the testa for the last twenty years; had business transactions with

HARVARD
LAW SCHOOL
LIBRARY.

him; had talked on religion and other subjects with him, and believed he was as free from insanity as any man. He had counselled with him at times." See page 139.

"David Humphreys stated that, in the latter part of the year 1832, or early in 1833, Col. Singleton had business with him, and frequent conversations from that time until the end of the year 1835, relative to money matters, the state of the currency, banks &c. and upon the subject of making a will, and the manner in which he should dispose of his property, and stated that his son William should never have any more of his estate, than what he had given him, *alleging he had treated him badly.* He further said, that there was nothing in his manner, expression, or any thing else, which fell under his observation, characteristic of unsound intellect; but on the contrary, he displayed much caution and prudence. Further stated that, he had some peculiar ways, and was more suspicious than any man he ever dealt with. He, Col. Singleton, spoke to the witness of the confessions he had made to his son William, and of the confessions in the family, in consequence of Harriet's child. The Col. spoke of the church meeting, and the committee, and on that occasion, he, Col. Singleton, either offered, or would have offered, to get down on his knees, to make friends with William, and that William had refused to be reconciled; when he was talking to him about William, he would shed tears, and showed great anxiety for reconciliation."

Mr. Humphreys is a man of great energy, enterprise and sagacity. He has accumulated a princely fortune by his superior qualities of mind; and I am sure that if he had detailed his evidence before this Court, they would have given more weight to him than a thousand Christophers and Sullivans. He conversed with the testator on many topics, and the old man told him of his troubles with William, laid open the secrets of his heart to him on that subject, and wept—but it was the grief of a father over a dissolute and reprobate son. In all the conversations on this and many other subjects, held through several years, before and after the making of the will, Humphreys "observed nothing in his man-

ner, expression or any thing else, characteristic of unsound intellect." Why? Because the old man was *sober* when he talked to Humphreys. Is it not " passing strange," when he related to Humphreys the whole of William's conduct, he did not get into a violent passion, instead of manifesting sorrow? Humphreys is not anxious to *break* or *sustain* the will. He had no *church dominion*, nor is he the old *lady's nephew.* What inducement had he to view the testator in any other than a fair light? He certainly was capable of penetrating his character, and had ample opportunity to do it.

John Garrett, who was born and raised in sight of Col. Singleton's, and a man of the first respectability and intelligence, " said he had known Col. Singleton from his infancy, that is to say, thirty years; that he had seen him in all the relations of life, and had never suspected that any derangement of mind existed, and had never heard such an *intimation.*" Is it not utterly out of the range of the rudest society, that Col. Singleton should have been infected with *monomania*, and John Garrett have known him for thirty years, in *all the relations of life,* and never to have heard such an *intimation?*

William Barr, another merchant of great acumen, " swore that he had lived in a house of Col. Singleton from 1823, for many years, and had transacted business the whole time with him, and *knew him well,* and believed he was a skillful man about trades. He had never seen or heard any thing indicative of mental derangement on his part. He said that, during that time, he had heard a report, that William Singleton had run his father and hands out of the field. A few days afterwards, William came to town, and witness asked him about it, and William told him that he was walking on the outside of his father's fence, with his gun, and the negroes and old man at work a little way off, and began a *conversation* to himself, by saying, I see some negroes who have been telling damned lies on me, and I will have their hides: then naming one, and pointing his gun at him, said I will have that fellow's hide, when the negro broke and run. He then said, I see another—when he broke

VIII. 48

and run; whereupon all of them took fright and fled— *his father with them.* William said it was all in fun. The witness stated it was some time before the year 1835, and his best impression was, that the occurrence took place in 1833, but that he could not be certain. The counsel for the defendants then asked him if William informed him, that he had told his father it was in fun. To which he replied *no,* and said that his impression was, that he said he *pointed the gun at the old man,* but of this he was not certain. He further stated that, he was a very suspicious man, and doubted the honesty of almost every man, and was frequently in great distress about something, to appearance." See page 141 of record.

Can it be possible that a man of Barr's keen, discriminating, watchful character, should have known Col. Singleton well from 1823, for many years, and never have seen or heard any thing of mental derangement, if he had been really so affected? You see Barr heard instantly of William's running his father out of the field, in 1833, and had curiosity to enquire about it, which shows he was not sluggish. Rely upon it that William Barr soon finds out all the defects and blemishes of his acquaintances.

"Calvin Hughes stated that, some time during the year 1833, he heard William Singleton say *many abusive things* about his father, and cursed him outrageously." See record, page 142.

What think you now of the old man's disinheriting William! Do the Court want proof, that the foregoing declarations, together with divers others, *were borne to the father's ears before he made his will in May,* 1834? The old lady tells you her husband said he had heard that William had cursed him. Mr. Jessee informs you that, during the pendency of the church controversy, the old man complained William had treated him badly. Humphreys shows that, in 1833, the testator complained bitterly of William's conduct; and he knew with absolute certainty that William had derided him with nocturnal songs, when he sat at his own fireside in '33; and *it is*

proved by Barr, that William had run him and all his la-
borers out of the field, in the same year.

In the opinion of the Court it is written—"If the
rash expressions of the son, after continued persecution
on the part of the father, were ever borne to his ears."
Do you not perceive, with inevitable certainty, from
the *testimony before you*, that the testator had not only
heard, but had seen and felt, the curses—"the many
disgraceful things said about him" by William, and his
vile conduct to him; and that, too, before he made his
will. If you do not, it is because you do not give cre-
dence to Mrs. Singleton and Jesse, witnesses for the
complainants, and Humphreys and Barr for the defend-
ants. But—"after continued persecution on the part
of the father," Col. Singleton is now in his grave, and
shall this be his epitaph? This opinion not only de-
scends to posterity, transmitting the principles which
are to govern in like cases, but bears upon its face the
character of the persons affected by it. A persecutor
is detestable—but he who would persecute his own son
is a fiend. Wherefore, I will examine the ground of
the charge.

It appears that, until Harriet brought forth a mulatto,
Col. Singleton loved his son William above any of his
children. They were members of the same church,
and dwelt under the same roof. On earth, their joys
were without separation—they expected the fruition of
Heaven without division. Their relation to each other
was double—parent and child, and *fellow christians*. The
duty of father, I have always believed, was to guard
the morals of his child, and reform any evil practices
with promptness and firmness. Col. Singleton, who
surveyed all the circumstances, thought William was
the father of Harriet's child; and the circumstance
alone, that *no other man has ever been suspected* down to
this day, is conclusive evidence to my mind, *that he is.*
He therefore, as parent, was bound to use all means in
his power to reclaim him from concupiscence with a
*negro slave*. His duty with his *natural son*, though not
precisely defined by civil law or rules of society—is
clearly laid down relative to his *spiritual brother*, by that

Spring Term
1839.

Singleton's
Will.

God whom they professed to worship and obey. What was Col. Singleton to do when parental influence failed to accomplish reformation? The Divine Code is not only plain, but imperious, in exacting his allegiance. He complied with its requisitions: which are—"If thy brother shall trespass against thee, go and tell him his fault between thee and him alone: if he shall hear thee, thou hast gained thy brother. But if he will not hear thee, then take with thee one or two more, that in the mouth of two or three witnesses, every word may be established. And if he shall neglect to hear them, tell it unto the church; but if he neglect to hear the church, let him be unto thee as a heathen man and a publican." 18 *Matthew*, 15, 16, 17. With this injunction the father complied; but the son abjured his allegiance, and expatriated himself from the church, and literally became to his father " a heathen man and a publican." Then it was William said to Hurst many disgraceful things about his father: the negroes dream about his not being in Heaven, and that they had been connected with a set of damned rascals at Clear Creek Church, and this too, *at a smith's shop:* he proclaimed in the year 1833, in the presence of Hughes, "many abusive things about his father, and cursed him outrageously." He admitted to Blackburn, the preacher, that he had said to Lewis Singleton that his father was a " *damned rascal;*" he confessed to Barr, he had, in 1833, run his father and negroes out of the field with a gun; he declared to his mother, that if he were not his father, he " would cut his throat!" And what said the father! He was "dumb like a sheep before his shearers." And this is the son, who commands the sympathy of the Court—and this this the father who has received their denunciation for " continued persecution." It is is to be hoped his final Judge will write less bitter things against him.

The Court continue—"It does not necessarily follow that his disinherison was caused by these rash expressions." Just as obviously as light follows the sun, and that *too* from the *testimony before this court.* This domestic feud had its incipiency some time before it came before the church, in 1832, and it was then made public,

and at that time William left the church and his father's house. The old man then had no will. When do we find the testator first complaining of William's "rash expressions?" Hear Mr. Jessee—Williams own witness, and in whom so much confidence is placed. "He never did assign any other reason for his violence against William, except the charge of intercourse with Harriet, and that *William had talked wrong of him; this took place in* 1832 *or* 1833. See record page 127. What does the invincible witness Mrs. Singleton say on this point? "I don't think he said much of Billy in the *last days of the old man.* I never heard Billy curse his father. I heard the old man say, *he had heard Billy had cursed him.* I heard him *complain* of William's singing and hallooing about—singing *religious songs.* Mamma, said Billy, I sing and halloo, as you hear, for the purpose of letting father know I am not strolling about his negro quarters." See page 124. The old lady does not name the time when the complaint was made—however, she says it was not in the last days of the old man. It is clearly inferable that the occurrences took place when the contest about Harriet was fiercest; which was in 1832, which is the time he complained to Jessee of *William's talking wrong about him.* But another of William's witnesses *shows the time.* Mr. Allen says, "I never saw William on the place—I have heard William *sing* about the place. The old man sent for me on one occasion, in the field, and said that *William was there with his gun, and threatened to shoot him* or some of the hands. I came and saw William with his gun, but he said nothing to his father or me. I lived with Col. Singleton in the year eighteen hundred and thirty three. See record, page 128. So that the singing and threat, as declared by the testator, to shoot, both occurred in 1833. Hurst does not name the time; but it is more than probable that all took place about the same time. Barr states that his admission to him, that he had run the old man and his negroes out of the field, was in 1833, to the best of his recollection. *Not until after all these events transpired, did the old man make a will.* And above all don't forget that the testator declared to the draftsman, when he made

his will, his *reason* for giving William no more of his es-. tate. To a look of inquiry on the part of Wilson, he answered—"Never was a father *treated* so badly by a son as I have been by William." Is it not now, to the Court, as apparent that William's treatment to his father induced him to disinherit him, as that it brought his "grey hairs with sorrow to the grave?" And shall he not be permitted there to rest without the blight upon his reputation—that while living, he persecuted his immaculate son William! "Sic transit gloria mundi."

To show the bias of Ben Taylor's testimony, I beg leave to call the attention of the Court to Goodloe Carter's evidence. He "stated he knew well the transaction related by Ben Taylor, about some money due from the firm of Cotton & Co.—his son being one of the company, and that he was unable to perceive any thing irrational in the matter on the part of Col. Singleton; but on the contrary, thought he was vigilant, prompt and energetic in collecting the debt. The witness also stated that he himself assumed the payment of one third of said debt." See record page 142. Here is a transaction in which Taylor saw Col. Singleton display unsoundness of mind; but Carter, having one third of the money to pay, thought he was vigilant, prompt and energetic in collecting the debt; and so would all Mr. Taylor's *thoughts* turn out, if other men had been present to observe Singleton's movements. The Court speaks of Taylor as Singleton's nephew. I wish it to be distinctly understood that he is the son of Mrs. Singleton's brother, and that all his feelings are with her.

"But it may be remarked that the witnesses generally who deposed for the defendants, had not the same opportunity afforded them as the complainant's witnesses, to arrive at the true knowledge of his condition. They were for the most part *mere general acquaintances*, who met with him occasionally. The facts deposed to by complainant's witnesses may be true, and not at all inconsistent with the facts or opinions proven by the defendant's witnesses." 1 take issue upon this averment; and shall proceed with the proof to establish the converse. First. Mrs. Singleton, I admit, had the best op-

portunity to view his conduct; but this is counteracted
by her anxiety to break the will, and advanced age.
Secondly. Allen, the overseer, had the best opportunity
to *know* his condition. He is the witness called by com-
plainants, but his evidence is altogether in favor of the
defendants. Thirdly. Ben Taylor, most of his time,
lived in a different county from Col. Singleton, and nev-
er lived at any time, so near to him, as Pinckard, Barr,
Garrett, W. B. Blackburn or Doctor Blackburn; nor
was he ever as intimate with him; nor did he see him
any thing like as often. George Blackburn did not know
him half so long as Thomas Bullock or William B.
Blackburn or John Garrett, or half so well as either of
them. Jessee—"I have known Col. Singleton *a number
of years.*" He does not say how long. He did not live
immediately in the neighborhood, and is a young man,
and confines his narrative of the testator exclusively to
the difficulty as presented to the church, with William,
except in this, to wit. that William had talked wrong
of his father in 1832, or '33. "Up to 1832, Col. Single-
ton at all times acted and spoke of William affectionate-
ly; *he was a good farmer and close trader; but not a very
smart man, a man of quick temper.*" Bernard Giltner—
"said he had been acquainted with the testator for the
last twenty years; had business transactions with him,
and had talked with him on religious and other subjects,
and believed he was as free from insanity as any man."
Jessee had *known* him; but Giltner had been *acquainted*
with him. Jessee says a *number* of years. Giltner says
*twenty* years. Jessee is a member of the church, and so
is Giltner, and a justice of the peace. Jessee is about
thirty years old. Giltner about fifty. Jessee does not
say he ever *talked* to him on any other topic than Har-
riet and Billy: Giltner says, he "had business transac-
tions with him, and had *talked* with him on religion and
other subjects." I challenge the judgment of the Court,
which of these two witnesses came nearest—"mere
general acquaintances;" and which of them had the best
"opportunity" of "arriving at the true knowledge of his
condition." Next comes Mr. Christopher. "I am a
a neighbor of old man Singleton. On one occasion, in

eighteen hundred and thirty five, *in the spring.*" He goes
on and says not *a word* relative to Col. Singleton, ex-
cept what transpired then,. and on *one other occasion af-
terwards.* See his statement at large, page 129. Mr.
Sullivan follows—"Some time in the forepart of the year
eighteen hundred. and thirty five, I went to the Colonel's,
at the request of William, and told him William wanted
to make friends with him. I honestly did believe that
the old man was crazy and was deranged. I came to
to this conclusion in eighteen hundred and thirty five."
See his statement at page 130 of the record.

Neither of the two last mentioned, has detailed an act,
expression or circumstance, which occurred prior to the
year 1835. I wish to draw the attention of the Court
particularly to the fact, that neither Christopher nor
Sullivan. *pretended* to inform the jury of any fact, cir-
cumstance or matter, in Col. Singleton's whole life,
which took place until the forepart of the year 1835.
The issue in the cause—as determined by this, and the
Circuit Court—is whether the testator, on the 17th day
of May, 1834, was of sound mind, and laboring under
an insane aversion to his son William—that being the
time of publishing his will. This case contains the unan-
imous judgment of affirmance of the judgment of the
circuit court, that the complainants were bound to prove
that, on *that day, the Testator was unsound in mind,* and in
consequence thereof, that they had the right to open the
evidence, and argument of the cause, and conclude the
same.

Can it be possible that this Court will solemnly ad-
judge, that events which have been detailed by Christo-
pher and Sullivan, shall be *admitted* to prove the state of
Col. Singleton's mind in May, eighteen hundred and
*thirty four,* which originated in eighteen hundred and
*thirty five?* It is not contended on the part of the com-
plainants, that he was permanently and generally afflic-
ted with insanity; but that he had an ephemeral and
particular visitation of lunacy. How then can any
thing which either of *them* said, illustrate. the issue?
But I have digressed from the object. I set out to prove
in relation to these witnesses, to wit: that their oppor-

tunity to know Col. Singleton's state of mind in May, 1834, was not so good as that of Helm and Bullock; and I have shown from their own evidence, of record before the court, that they have not only failed to prove, (or any one else for them,) that they had any opportunity at all to know his condition then, to wit. on the 17th day of May, 1834, the time he made his will; but they have *wholly failed to prove they knew any thing about him.* So much for their "opportunity!"

The only other witness for the complainants, Hurst, does not say a word about Col. Singleton.

What do the witnesses for the defendants prove as to " opportunity of arriving at the true knowledge of the testator's condition?" Samuel Wilson says—" That he had been intimately acquainted with Jeconias Singleton, the testator, for ten years preceding his death; and had transacted his law business for him during that period, and frequently conversed with him on a *great variety* of subjects—taking much pleasure in hearing him talk." Page 131. George M. Pinckard said—" My acquaintance with Mr. Singleton commenced in 1823, and continued to December, 1835. For the first two years of our acquaintance, I was often with him, from the fact of living in one of his store houses. After that period, to the fall of 1826, my intercourse was very limited—not transacting any business with him. From the fall of 1826, until that of 1830, I again occupied a store house belonging to him, and I presume, within that time, transacted a large portion of his business. From the fall of 1830, to December, 1835, my intercourse with him was limited, not having any business transaction with him, or more intercourse than the usual civilities with an old friend and acquaintance." Page 137.

Col. William B. Blackburn "stated that in 1802, he settled near to Col. Singleton, and had been intimately acquainted with him since. He had transacted business with him at various times, and on a variety of subjects, and had been associated with him in political contests." Page 138. Thomas Bullock "said that he had known Col. Singleton for forty years, twenty of which he had lived a *neighbor* to him, and that during the other twen-

VIII. 49

ty he had lived some seven or eight miles from him, and had been intimately acquainted with him. He stated that he had a great many dealings with him, and frequent conversations on religious and other subjects." See page 138. Churchill J. Blackburn "said that, twelve or fifteen years ago, he was the *family physician* of Col. Singleton. Page 138. Thomas Helm "stated that he had lived about two miles from Colonel Singleton the last *thirty years, and had known him well.*" Page 139. Bernard Giltner I have already put into the opposite scale to Jessee. David Humphreys "stated that, in the latter part of the year 1832, Col. Singleton had business with him, and frequent conversations from that time until the end of the year 1835, relative to money matters, the state of the currency, banks &c. *and upon the subject of making a will, and the manner in which he should dispose of his property.*" See page 139. John Garrett said "he had known Col. Singleton from his infancy, that is to say for thirty years—☞that he had seen him in all the various relations of life." See page 140 of the record. "William Barr swore that he had lived in a house of Col. Singleton's, from 1823, for many years, and had transacted business the whole time with him, and knew him well." Page 141.

I have now shown what opportunity Mrs. Singleton, Benjamin Taylor, George Blackburn and Mr. Jessee had of arriving at the condition of Col. Singleton's mind in May, 1834, being four in number; and that Mrs. Singleton and *her nephew* Taylor were not free from bias. I have likewise exhibited to the Court that, although Allen was introduced by the complainants, and had the best opportunity of all the witnesses to learn Col. Singleton's character; that he turns out the *strongest witness for the defendants.* As to Christopher and Sullivan, it is proved by themselves, that they neither had *opportunity to know,* nor *did they know,* any thing about Col. Singleton until the spring of 1835—a year after he made his will. I have presented to your view the opportunities of Samuel Wilson, George M. Pinckard, William B. Blackburn, Thomas Bullock, Churchill J. Blackburn, Thomas Helm,

David Humphreys, John Garrett, Bernard Giltner and
William Barr, and Allen—eleven in number. In weighing the evidence as set out in the record, you will have to respond to the issue which I have taken on your opinion, or that portion of it which declares—"But it may be remarked that the witnesses *generally* who deposed for the defendants, had not the same opportunity afforded them as the complainants' witnesses, to arrive at the true knowledge of his condition. They were for the most part *mere general acquaintances*, who met with him occasionally." I am not unmindful in submitting this issue to your decision, that all men have a strong predilection for their own views of things—but "Truth is mighty and will prevail."

To the junior member of the Court, I beg leave particularly to address myself on the subject of influence having been exercised by the defendants over the testator, to procure the will to be made as it is. In his opinion, I think I discern an impartial, but greatly sensitive mind, agitated by a delusive view of the facts in the cause; and therefore have every reason to believe that, when the evidence upon that head shall be spread before him, as it exists *in the record*, he will unhesitatingly change his opinion, *at least to consent to a re-hearing.* I will cite one sentence only of the member's opinion, which shows the state of *his mind, and the basis on which he acted.* "While therefore I am free to say that if there had been no *rational ground*—as in my opinion there is— for the deduction that the will was procured by the extraneous and *undue influence* of the defendants or some of them, I should have had *great doubts* at least, whether the verdict ought to be sustained." I will demonstrate that there is not a particle of evidence in the record upon which the inference can be based *according to the rules of law*, that the defendants by "extraneous and undue influence procured the will."

The only witness who proves a semblance of influence is the old lady, with all her obliquity of sentiment. I will give her own words. "His sons had a very great influence over him. The boys, all but William, when they came to see us, would ask if William had quit

drinking yet. And that the old man had better give his property to them: they had families and children, and William had none." I again repeat this is the only attempt to *exercise* influence, to be found in the record; and this the law recognizes as being perfectly legitimate. *Starkie*, 1707, writes—"According to the ecclesiastical law, importunity, in its legal acceptation, to avoid a will, must be such as the testator is too weak to resist, and in such a degree as to take away his free agency." Can any philosophical mind say that the above proof establishes any *importunity at all*, much more, "such as the the testator is too weak to resist, and in such a degree as to take away his free agency." The boys all, when they come to see us, would ask if William had quit drinking. That William did drink, was well known—and will the Supreme Court of Kentucky originate the doctrine that it is "extraneous and undue influence" over the father, for the sons anxiously to inquire for the reformation of a dissipated brother, and condole with their aged and unhappy parent! But, ah! the motive. And are you not *bound in law* to consider it *good* until the contrary shall be made appear. Will you decide that it is unlawful for a man to be *concerned* about his brother's morals, and overrule the maxim that—"It is alike against the law and duties of charity to *presume* an evil intent." This would be erecting *yourselves into* a bench of casuists, rather than jurists. The old lady continues —that they said, " the old man had better give his property to them: they had families and children, and William had none." Who is here that will say that there is any "extraneous and undue influence" in this, or that it is unlawful or even objectionable, or that it is not right and proper? "A man has a *right*, by fair argument or *persuasion*, to induce another to make a will, and even to make it in his favor." *Miller & al.* vs. *Miller*, 3 *Serg. & Rawle*, 267. *Swinburne, part* 11, *sec. 5. Style*, 427. Here is authority directly in point and as strong as man can make it; but reason is still stronger. All the testator's sons had as much property as *they* wanted. Was it not then a fair argument, and a thing right and proper in itself, that the father should not give any more

of his property to William, who had no family or *chil-dren*, but should bestow it upon his sons who had families and children? To my mind nothing could be more meet. But then they inquired whether William had quit drinking yet. Bound as you are by law and charity to believe the motive good, suppose that they had insisted upon that delinquency of character as a *reason* the old man ought to give them that portion of his estate which he might have been disposed to have bestowed upon William, if he had been a sober man. Is not drunkenness in itself a sufficient cause for the father to withhold from an unmarried son, more of his estate than is sufficient to supply him with "food and raiment?" and shall not other members of the family urge his vices and profligacy, to hinder his obtaining his father's hard earnings, to squander upon "harlots and in riotous living"? And shall the brothers be cut off from the inquiry whether "the prodigal son had returned," and run to meet him and adorn his person; join in the feast, and send up to Heaven the sweet accord of sounds—"that he who had been lost was found." Oh, no! the inquiry shall be *imputed to, and presumed to spring from, a bad motive*, until the contrary shall appear by proof!

I have been presenting this argument as though the boys had addressed their father: which is not the fact. The old lady says—"And that the old man had better give his property to them." They spoke *to her, of him*. And this view is strengthened—indeed confirmed, by what she in another place says. "I heard the old man say that the boys said that, he ought not to give William and Brown much of his property." She therefore, proves that she never did hear either of the boys attempt to influence the testator, by "fair argument or persuasion," as I have shown they had a right to do, (3 *Sarg. & Rawle*, 267, and other authorities,) or by importunity; which to avoid a will, "must be such as the testator is too weak to resist, and in such a degree as to take away his free agency." *Starkie*, 1707. And further to show that she never did hear them, or know them to *exercise* any influence over their father, is apparent from other declaraions made by her, to wit. "I believe my husband was a

just man, and an honest man. Justice is justice. Truth and justice go together; and they are all *my children*, and *I do wish the will should be broke.* It is my wish to say nothing but what is true, they are all *my children*, and the old man's. I never heard John, Lewis or Elijah say once to their father, you and William make friends, or any thing of the kind. They never went to see William; and this is the reason why *I think* they influenced the old man." See record, page 124.

This settles conclusively that she *knew* nothing on the subject, because, if she had, she unquestionably would have detailed facts, instead of giving reasons why she "THOUGHT they influenced the old man," and that at the very moment when she exclaimed—"I do wish the will should be broke!"

But John was heard to say in the father's presence, though not addressing himself to him, that there was a resemblance between Harriet's mulatto child and William; and this must be construed into an attempt to *exercise* undue influence over the testator, when the same witness proves that it excited his displeasure against John, rather than won his favor. Ben Taylor though, proves that Lewis asked him, if it was possible that he thought that his father ought to make an equal distribution of his property. And this is supposed to be *proof* that Lewis *exercised* undue influence to procure the will.

I have now quoted every particle of the evidence which can, in the most remote manner, be brought to bear upon the question of undue influence. I will proceed to show that the position taken by the junior member of the Court, is in direct conflict with the law, as *unanimously* declared by this Court, in the case of *Elliott's Will,* 2 *J. J. Marshall,* 342, 3, 4. "Many witnesses detailed conversations had with William Elliott, the son of the testator, which *evince much anxiety on his part, to secure to himself, the property of his father.* It is also shown that the testator, under the apprehension of being reduced to want, in consequence of the debts pressing, on account of his son, the constable, was willing to convey his property to his son William, or any other friend, with a view to save it. With this view, a consultation was

had with one of the witnesses, who dissuaded him from it. It is also shown that, for some time before his death, his son William managed his affairs for him, and he sometimes declined transacting business with those who visited him, and refered them to his son. *Under these circumstances, it may be readily believed that, the son's influence was not inconsiderable with the father.* It is moreover shown, that the testator was illiterate. He declared to one of the witnesses he could not write. Hence there is great reason, at his advanced age, to rely on the assistance of his son in doing business, and it would be very natural for him to yield his assent, to almost every proposition in relation to business, that his son would make. But there is *no proof* that William Elliott, junior, *exercised any influence*, which the *ascendency* he had acquired rendered possible, in *controlling* his father, and *inducing* him to dispose of his property, contrary to his settled inclination and judgment. A weak mind, if left to itself, may make a will, which we would not disturb, but which would be set aside if it *were shewn,* that the thoughts and arrangements of such a mind, were operated upon by the influence of a child, who thereby promoted his interest, at the expense of his brothers and sisters. *But such undue and improper influence must be exercised and proved.* In this case it has not been done. It is shewn, we admit, that some years before the testator's death, he had a sale of property among his children, with a view to distribute it, and kept an account of values, according to the bidding, advanced to each, in order thereafter, to make an equal distribution among them, as he declared, after this, and before the will was made, his circumstances experienced a great change. One son brought ruin upon him, by failing as a constable; another seized and took off some horses, without permission; the testator complained, that his children, except William, had forsaken him. If those things were true, (and that they were, the evidence conduces to prove,) he had reason to declare—as one of the witnesses said he did—that those who had thus forsaken him should get no more of his estate. Under such circumstances to secure it to his wife, for life, with remainder to his son who had waited on him, and

done his business, in the last years of his existence, was *reasonable, and just as it should be.*"

The rule established by the whole Court, in the above case is, that "undue and improper influence must be *exercised and proved.*" But this is overruled by a divided Court, and the rule given is that—"if there be *rational ground for the deduction* that the will was procured by extraneous and undue influence." These are antagonist rules; and which of them is most reasonable and supported by authority, I have heretofore shown.

Can the Court hesitate for a moment, to pronounce that, in Elliott's will, there was much stronger proof of undue influence having been exercised, than in Singleton's will? Yet in the former case, the Court unanimously pronounced that no undue and improper influence was proved to have been exercised.

Upon the other branch of that case, as well as this, I will show that the proof of unsoundness of mind was much stronger against Elliott than Singleton.

First. "The want of capacity or soundness of mind, on the part of the testator."—"The subscribing witnesses to the will declare, that they discovered, at the time of its execution, nothing like alienation of mind. On the contrary, they bear testimony that, the testator possessed a degree of mental or intellectual power, which qualified him to dispose of his property by will. The draftsman of the will stated, that the testator had a paper once written for his will, which the draftsman read over, and enquired what alterations the testator wished him to make; that the testator then gave him directions as to the alterations he wished made, and that he wrote the will according to the directions received. The will, after it was written, was twice read to the testator. He said it was right. He rose in his bed, and signed it by making his mark. The facts detailed by the draftsman of the will, leave do doubt on our minds as to the sanity of the testator at the time. He also stated, that he saw nothing like dictation to the testator, on the part of his son William, who is supposed to have exercised undue influence over the old man, his father. Many other witnesses introduced to testify to

the sanity of the testator, stated conversations had with him, and business transacted with him, all evidencing the existence of powers of memory, judgment and reason, both before and after the date of the will, in relation to a variety of subjects. These witnesses abundantly confirm the opinion, that the testator was possessed, at the date of his will, of such soundness of mind, as to have legal capacity on that ground, to make a valid will and testament. The opposing testimony showed that afflictions of body and mind produced, in the opinions of several witnesses, such mental debility as to render the testator incapable of making a sound disposition of his property, or of exercising a discriminating judgment in regard to it. But these witnesses did not detail any acts or expressions, on the part of the testator, which established *habitual*, much less *constant, alienation* of mind. Their evidence amounted to no more than showing that age, disease and sorrow, had combined to *enfeeble* the understanding of the testator, *not to extinguish it.* It cannot be admitted that intellectual feebleness is sufficient to deprive an adult man or woman of the *right guarantied by law*, to dispose of their estates by last will and testament, unless the weakness be to such an extent, that the disposition of the estate attempted, BEARS ON ITS FACE INTRINSIC EVIDENCE OF A DERANGED AND POWERLESS UNDERSTANDING. A mind not wrecked by a fixed and settled derangement, partial or general, although weak, if capable of taking a survey of all the testator's estate, and capable of dictating, in a connected, intelligible manner, a disposition of the property according to its wishes, without being prompted or swayed, by direct intermeddling, from officious or designing relatives or pretended friends, in our opinion, is sound, in the contemplation of the statute of Wills."

Who can read the testimony by the subscribing witnesses, Wilson and Pinkard, to Singleton's will, and then turn to *Elliott's will*, 2 *J. J. Marshall*, 341–2, as just quoted, and not instantly perceive, that totally different rules are applied in the destruction of Singleton's will, by a portion of the Court, from those laid down by a

VIII. 50

united Court, in upholding Elliott's will, which came in a far more " *questionable shape.*"

Let us apply Lord Coke's test to Singleton's capacity to make a will. " To make a will valid, it is not enough for the testator to have had memory sufficient to answer familiar and usual questions, but he must have a disposing mind, so as to be able to make. a disposition of his estate with understanding and reason."

Will any man say that Col. Singleton's will was not made with understanding and reason, and what is still more excellent, *with perfect propriety!*.

Lessee of *Hoge* vs. *Fisher et al.* 1 *Peters, Rep.* 164. " If a testator, *at the time of dictating his will*, has sufficient discretion for the purpose, and be able to recollect, at the time of executing it, the particulars he has dictated—this is evidence of a sound and disposing mind and memory." Who ever came up to this rule more completely, than did Singleton?

We will look to the rule given by Kent, in the last edition of his Commentaries, after half a century's devotion to the theory and practice of the law. " Imbecility of mind is not sufficient to set aside a contract, when there is not an essential privation of the reasoning faculties, or an INCAPACITY OF UNDERSTANDING AND ACTING IN THE ORDINARY AFFAIRS OF LIFE." *Kent's Com.* 2 vol. 451. No man that has ever lived, could have stood this test better than Col. Singleton.

Let us apply the test of Chitty to Col. Singleton, who wrote with all the lights which the world affords on the subject, before him. It must appear to the jury that the person is *non compos mentis* at the time the act is done, to escape from its effects civilly or criminally, and not at any anterior period, which can have no bearing upon any case whatever. *Chitty's M. J.* 359.

I will now prove that Singleton's will ought to have been established agreeably to the opinion of the whole Court, in the case of *Johnson* vs. *Moore's heirs*, 1 *Littell*, 371, 2, 3, 4.

" He had no wife or children, but had two or three brothers, who reside in this country. He had owned some slaves, all of whom were dead or sold before his

death, except one female, who lived with him, as was supposed, in a state of concubinage, and possessed considerable influence over him.   Her he had emancipated by a written instrument, recorded, to take effect at his death.   During his extreme illness, which took place about twenty five years since, he was a great portion of the time in a complete state of derangement: talked wildly about his immense stores of wealth, and conceived an antipathy against his brothers, contending that they designed to destroy or injure him, although they attended him constantly in his illness.   Of this antipathy, he appears not to have been entirely free, during his life, at all times.   He was extremely passionate and irritable in his temper, but more so when intoxicated, and frequently became the sport of boys and others, who, for their wanton amusement, delighted in irritating him.   He tenaciously retained his property, and was cautious in his dealings.   But still, when irritated or inebriated, he would relapse into the same paroxysms of insanity, which appeared in his former sickness, manifested by his extravagant and false boasting of his immense stores of wealth, and his great hostility to his brothers and their families.   There is but one period at which he appears to have been entirely divested of this, and that was in 1820, when he executed a will, giving to his female slave fifteen hundred dollars, and to others some small legacies beside, and the rest of his estate he devised to these relatives.   But afterwards, in October, 1821, he caused another will to be made, disinheriting his relations.   This appeared to be his chief object in making the last named will.   For, although he could specially direct the writer to do this, he could not name, after giving a portion to his female slave, any other devises, but left the places for their names blank. Neither could he fix upon any executor, and for that name left a blank also.   And thus he executed the paper, and deposited it with the writer, where it remained till his death.   We are therefore satisfied that, on this point, we mean that of hostility to his brothers *without cause*, he was subject to a species of derangement, which affected him there, and no where else, except with re-

gard to his extraordinary wealth.   As in one point only,
except when under the influence of intoxication, he was
subject to a peculiar species of derangement, which
cannot be explained, but by the existence of the fact,
unless we could measure and scrutinize the mind, we
have no hesitation in saying he was competent to do
any act, which was not subject to be influenced by that
derangement, and that he might be the subject of re-
sponsibility, both civilly and criminally, for any act
which was not influenced or induced by it.   *And if the
persons as to whom his mind was disordered were strangers, and
could not be supposed, by the ties of natural affection, to be the
objects of his bounty, we should have no difficulty in sustaining
this will.*   To them, it might be supposed, or to some of
them, he would have given his estate."

In this case, Moore's mind was not only influenced
by the concubine, but deluded and absolutely perverted
palpably; yet, the Court unanimously decide that he
would have been responsible for criminal and civil acts,
and they would have had *no  difficulty in  sustaining his
will,* if the objects of his bounty, or *any of them,* had
been his kindred.   This is the obvious meaning of that
clause of the opinion [in italic] which I have under-
lined.   Now I ask, have you not, in that very case
which is above cited, the law declared, most explicitly,
upon every point agitated in this cause.   Singleton be-
stowed his property, after providing for his wife, upon
his three sons, who had wives and many children each
of them,  declining to give Miss Rust any thing, if she
married Ford, who was courting her, and to whom he
objected; his daughter Mrs. Brown being in affluent
condition, and beyond procreation, and without child,
and in bad health; and his son William having debauched
his negro girl, and sung songs in derision of him around
his house, and published many disgraceful things of him,
to Hurst, at a smith's shop, and to Hughes, at a differ-
ent time and place, and cursed him outrageously, and
run him out of his field, with all his slaves, and declared
to his mother, that if he were not his father he would
cut his throat, and being upwards of thirty five years
old, without wife or child, except Harriet's mulatto, and

possessed of a farm and slaves, and every thing which
could afford *him* enjoyment.

On Moore's will, the Court declared that, if he had
given all his estate to one of his brothers, to the exclu-
sion of the rest, although there could have been no
good reason for it, they would have had *no difficulty in
sustaining his will.* Singleton gave his estate to all his
children who needed it, and withheld from those only
who did not; and one of the latter, so far from rioting
upon the father's hard earnings after his death, ought to
have had that taken from him which his father had given
him while living. The statute of wills ought to be re-
pealed, if men shall be prevented from disinheriting such
scoffing and rebellious sons as William Singleton *is
proved before this Court* to have been. ' William broke his
father's heart, and is now about to squander his estate!

I ask the attention of the Court to *Violet's Will*, 1
*Bibb*, 617, and *Harper's Will*, 4 *Bibb*, 244. Both of
which wills were sustained by the Court of Appeals,
and both of which had been condemned by the County
Courts of Woodford and Fleming, for want of sanity in
the testators. They were made under much more in-
auspicious circumstances than Singleton made his; yet
they were rejected by the County Courts, and approved
by the Court of Appeals; and his established by the
County Court, but invalidated by the Court of Appeals.
Whence such vascillation?

I crave an examination by the Court, of *McDaniel's
Will*, 2 *J. J. Marshall*, 331 to 340, inclusive.

I have been giving precedents and principles estab-
lished in Great Britain, and in other-states of the United
States, and by other Judges of the Supreme Court of
Kentucky. I will now cite the precedents of the iden-
tical Judges who decided Singleton's will case. I beg
that the testimony in *Wasson's Will* may be brought to
mind. In that case it appeared, that Wasson was great-
ly enfeebled in body and impaired in mind, and incapa-
ble of transacting ordinary business, and contracted a
hatred to some of his children, alleging, as the cause,
their frequent visits to see their mother, on her death
bed, which he construed into a desire on their part, to

rob him of his property. He was taken to his son's house, and there, under the influence of that son, made a a will, and that son his *sole devisee.* There was contrariety of evidence; but on all the points, to wit. insanity, insane aversion to children, and influence by them, I have no hesitation in saying the testimony against Wasson, was stronger, on each ground, than that against Singleton; and the issue involved the identical matter. The County Court of Oldham rejected the will on the issue, and this Court, on the 16th of October, 1838, just four days before the argument of Singleton's case, reversed the judgment of the County Court, and estab. lished the will, and that too without giving a written opinion, as far as I can discover from the papers.

The will of Samuel D. Jackson, of Bourbon, is the strongest case I have been able to find in England or America, *in sustaining a contested will.* Jackson devised nearly all his property to two *nephews,* sons of different brothers—passing by brothers, sisters, and all other kindred. It was proved by the draftsman of the will, that the testator had been a constable a long time, and understood business, and knew well, whilst he had acted as constable, the difference between executor and administrator, and that when he named Thornton as his *administrator,* as is written in the will, the draftsman reminded him that he ought to be styled *executor.* The testator was rather displeased, would hear no explanation, and peremptorily commanded him to write administrator.

"Margarette Griffing states that, she was at the house of Samuel D. Jackson, deceased, the day the will was written by Thomas Jackson. She had staid there the night before, and remained next day, until Thomas Jackson came, and when Samuel D. Jackson observed to Thomas, that he wanted him to do some writing, she left. He was on that day deranged, and his conversation was wild and flighty, and such had been his situation for some time before: A few days before his will was written, this affiant was at his house; he was then lying on a pallet on the floor, and would amuse himself by drawing figures on a blanket, and folding it to correspond with them, and would ask this affiant, when he would make a

fold, if it was right. He amused himself like a child in this way, for the whole evening. This affiant saw him again on the day the will was written, and the following, and he was more insane than on the day the will was written. It was after Samuel D. Jackson had been *stricken on the head* by one of his slaves, that affiant discovered his mental infirmity, and from that time until his death, she never saw him, which *was frequent*, that he was capable of doing business, or in his proper mind, as witness thought. She has heard him, no doubt an hundred times during that period and throughout the whole of it, complain of the bugs plaguing him. There were moments when his conversation seemed sensible—but directly, he would wander off to other subjects, and his conversation become extravagant and wild." Signed Margarette Griffing. See her deposition filed amongst the papers in the cause.

William S. Bryan states that, in the latter part of the winter, or early in the spring, 1832, he purchased some hemp seed of the late Samuel D. Jackson, who then appeared to be complaining, and a good deal stupified. Some short time thereafter, he offered to pay said Jackson for said seed, and he had no recollection of it. This affiant had some business with said Jackson throughout that year, and saw him occasionally, until he was confined before his death, and he is clearly of opinion that, from the spring or summer of 1831, that said Jackson was *deranged* and *incapable of doing business.*" See his deposition in the papers.

"Asa B. Edes states that he was acquainted with the late Samuel D. Jackson for some years before his death; that he recollected, in the summer of 1831, said Jackson brought one of his negroes to town, with a gun in his hand, and his clothes bloody, for having struck him. It was some time during that year, that this affiant saw a horse in the possession of Jackson, that he wanted, and he thinks in the fall. He tried to swap with said Jackson, for said horse, but discovered that he was too *much deranged to be fit to trade, or attend to business*, and he declined to attempt to trade with him. Affiant was a constable, and saw said Jackson, on, from that time frequent-

Spring Term
1839.

*Singleton's
Will.*

ly, until he was confined before his death, mostly at the shop of Boone Ingles, Esquire, which he made a stopping place. He very often heard him talk about the bugs in his head. He once took this affiant to his house, to correct his negroes, of whom he had complained often; but affiant discovered that Jackson's complaints of them were not very well grounded, and that he was too insane and unreasonable to have them corrected, and he declined to do it. He states that, as often as he saw said Jackson, from the time of attempting to swap horses with him, until his confinement before his death, which was very frequently, he was evidently *deranged and incapable of doing business.*" Signed Asa B. Edes. See his deposition on file in the cause.

Boone Ingles states that he knew the late Samuel D. Jackson for many years before his death; that in the fall or winter of 1831, he discovered said Jackson was *deranged*; that he stopped at this affiant's shop, with whom he traded, and talked very wildly and irrationally about bugs getting into his head, and he continued wild and flighty until his death, which was about two years afterwards. He frequently would stop at affiant's shop and talk with him when he came to town, and would often talk about his bugs. This affiant is of opinion that, for something like two years before his death, said Jackson was not competent *at any time* when he saw and conversed with him, to dispose of his property by will. He purchased his shoes of this affiant, and at one time insisted upon paying him in advance—saying he had some *trash*, and offered fifteen dollars in *United States paper*, saying he knew it was going down, and would soon be of no value. He then paid this affiant his account in another five dollar note, and this affiant handed him the change. In a *few minutes*, he offered another *five dollars*, when this affiant told him, he had already *paid his account and received his change. But he insisted he had not.*" See deposition on file in the papers.

"Jonathan Massie states that, he was acquainted with the late Samuel D. Jackson, for many years before his death. That for about two years or upwards previous to that event, said Jackson was *evidently deranged*. This

affiant had business with and saw and conversed with him frequently, as he had been and continued for some time after his derangement, to be indebted to this affiant. He has heard said Jackson talk frequently about the bugs that would get in his ears, and he was wild and disconnected in his conversation. This affiant does not believe that, at any time he saw him, for about two years or upwards before his death, that said Jackson was of sound mind, or in a proper situation to attend to business. There is no doubt, that for about that period of time, he was of insane mind." See his deposition on file amongst the papers in the cause.

"Zadock Smith stated that, he lived about half a mile from said Jackson, and saw him frequently *about and before* the date of his, said Jackson's will; that Jackson's health was feeble, and from many conversations he had with him (Jackson,) he (Smith,) considered said Jackson of *unsound mind.* He stated that Jackson kept his head wrapped up in flannels or handkerchiefs, and complained of being pestered by bugs getting into his ears. He said he knew where they lived in the day time, in a certain hollow ash tree, on the ridge between his house and Smith's, and at night they would come down to his house, and when he would go to bed, they would come in and get into his ears." See his testimony in the papers.

There is some other testimony of record, impeaching the capacity of the testator; but I shall not take the trouble to copy it; for if the foregoing be not satisfactory, I do not know what would be. It does not appear of record, what the evidence was in support of the will; though I was present in the Court of Appeals when the witnesses were examined. Some were examined against the will, whose statements do not appear. Not so many witnesses were brought forward to prove the sanity of Jackson, as were to testify to Singleton's; nor were they men qualified as well to judge of the subject; nor did they speak in the same clear, intelligible and satisfactory manner. My attention was *fixed* upon this case, and with deep interest did I listen to every word in it, and mark with precision every step in its progress—be-

VIII. 51

Spring Term
1839.

*Singleton's
Will.*

cause at September term, 1837, I had lost Singleton's case, which was far more favorable, and I had been told by one of the counsel engaged in it, opposed to me, that Jackson's will would be brought up for trial at the ensuing session of the Court of Appeals, and that the decision in it would settle Singleton's case; wherefore, on the 1st of November, 1837, with great anxiety, did I hear the investigation; and, on the 2d, the day succeeding, did I listen with peculiar pleasure, to the opinion of the unanimous court, delivered by the *same member* who wrote the main opinion in Singleton's case, which (opinion in the case of Jackson's will,) is as follows:—"We think a preponderance of proof is in favor of the competency of the testator to make a will, at the time when the will in question was made. The judgment of the County Court is, therefore, reversed, and the will ordered to be recorded in this Court, and certified for record in the County Court." See the opinion endorsed upon a paper in the case.

Jackson's was a singular case, and no doubt the facts and circumstances detailed upon the trial, made an abiding impression. I shall, therefore, without comment, and drawing the parallel between his and Singleton's situation, leave it to the impartial and enlightened judgment of the Court, to determine whether the liberal, mild and tender application of rules and principles of law, which enabled Jackson to *transmit his estate by will*, operated in *disfranchising Singleton*.

From the great amount of property involved in the contest, the novelty and intricacy in the propositions debated, and, as research and reflection often elicit light upon any and every debatable subject, the Court are most respectfully, but earnestly, entreated to grant the appellants a re-hearing.

*John M. Hewitt.*

June 20.    THE Petition, having been considered by the Court, was *overruled*, without response.